**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **UNDER SEAL** |
| **v.** | * | |
| | * | **Criminal No.  CCB-16-0267** |
| **DANTE BAILEY,** | * | |
| | * | |
| **a/k/a Gutta,** | * | |
| **a/k/a Almighty,** | * | |
| **a/k/a Wolf,** | * | |
| | ****** | |
| **Defendant.** | | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant, Dante BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf," was the founder and leader of an extremely violent and destructive Bloods gang known as Murdaland Mafia Piru, or MMP.  He ordered and committed numerous murders in order to retaliate against rivals, impose discipline within the gang, and eliminate potential witnesses against the gang.  He distributed large volumes of heroin and crack cocaine in the gang's territories in Northwest Baltimore.  He indoctrinated a generation of youths from his neighborhood into a life of crime and senseless violence.   After he was arrested, he continued to conduct the gang's affairs from behind bars, ordering hits on rivals and witnesses, and plotting various ways to obstruct justice.  He has showed absolutely no remorse for his offenses and no intention of stopping his criminal activity. He continues to present a grave danger to the public.

On May 1, 2019, following a roughly six-week trial, a jury convicted BAILEY of one count of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count One); one count of conspiracy to distribute a kilogram or more of heroin and 280 grams or more of crack cocaine, in violation of 21 U.S.C. § 846 (Count Two); one count of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Three); one count of possession of

firearms by a felon, in violation of 18 U.S.C. § 922(g) (Count Seventeen); and one count of possession with intent to distribute heroin (Count Eighteen).   With respect to Count One, the jury found that it was reasonably foreseeable to BAILEY that the pattern of racketeering activity carried out in furtherance of the conspiracy would include murder, extortion, conspiracy to distribute drugs, drug distribution, witness tampering, and witness retaliation.

As discussed more fully below, the sentencing guidelines call for life imprisonment, which is also the mandatory minimum sentence under 18 U.S.C. § 1959(a)(1).   But regardless what sentencing guidelines apply or whether any mandatory minimum sentence applies, the government respectfully submits that a sentence of life imprisonment is necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553, namely, (1) to reflect the seriousness of the offense, which involved horrible murders, shootings, long-term trafficking of deadly drugs, and efforts to obstruct justice including by killing witnesses; (2) to afford adequate deterrence for criminal activity that has a devastating impact on the community; and (3) to protect the public from a defendant with a serious criminal history and high likelihood of recidivism.

## I.   FACTUAL SUMMARY

The evidence in the case stems from a lengthy investigation conducted by the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), the Department of Homeland Security, Homeland Security Investigations ("HSI"), and state and local law enforcement.   The investigation involved 3 ATF-led wiretaps in July and August 2016, 8 HSI-led wiretaps in June and July 2015, roughly 26 controlled purchases of narcotics and firearms; search warrants executed on over 22 residences and vehicles, 86 cell phones, and 26 social media accounts; cell site location information for over a dozen cell phones; hundreds of recorded jail calls and visits; dozens of

intercepted jail mailings; DNA and ballistic evidence; and the testimony of numerous cooperating witnesses.  Over the course of the investigation, law enforcement officers seized roughly 42 firearms, over a kilogram of heroin, over 280 grams of crack cocaine, and gang paperwork from a variety of locations.

Over the course of the roughly six-week trial, the government called over 50 witnesses and introduced over 1,000 exhibits.  Below is a summary of relevant facts supported by the evidence presented at trial.

### A.  Background Regarding Murdaland Mafia Piru (MMP)

Murdaland Mafia Piru ("MMP"), also known as the "Mob" or "Mobsters," was a violent subset of the Bloods gang that for many years controlled the drug trade in large swaths of Northwest Baltimore City and neighboring Baltimore County.  MMP also had offshoots in East Baltimore City and other cities such as Washington, DC.  MMP was descended from the Tree Top Piru ("TTP") subset of the Bloods gang, and was founded and led by the Defendant, Dante BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf."  After his release from prison in 2011, BAILEY flew to California to meet with West Coast leaders of TTP and gain their official approval for the MMP set in Maryland.  *See* Gov. Exs. IC14; SM1, at 77–82, 104–07.

BAILEY organized MMP hierarchically, with a "Don" or "Godfather" at the top (BAILEY) and various "Bosses," "Underbosses," "Capos," "Lieutenants," and "Mobsters" underneath.  *See* Gov. Ex. GP2a.  BAILEY also wrote and disseminated MMP gang paperwork laying out certain rules of conduct by which members were governed, including that "retaliation is a must," "[w]hen at war fight like you are ready to die," and "[w]henever we are forced to strike, our only option is to kill."  *Id.*  The most important rule was a rule against cooperation with law

enforcement or "snitching."  MMP gang paperwork explained that "co-operation with authorities that lead[s] to incriminating others" was punishable by death.  *Id*.  MMP members enhanced their status in the gang by carrying out acts of violence; for instance, members could earn a "lightning bolt" tattoo for "killing for the Mob."  BAILEY has multiple lightning bolt tattoos on his face.  *See* Gov. Ex. GP11a.

Prospective members of MMP were required to successfully complete an initiation process and recite an oath of loyalty called the "Omerta Code."  *See* Gov. Ex. GP2a.  MMP members were sometimes required to pay dues to the gang consisting of a portion of the proceeds of their criminal activities, and they were subject to reprisal—and sometimes murder—for failing to do so.

MMP members operated street-level drug distribution shops in various locations in Baltimore City, where they sold heroin, cocaine, crack cocaine, fentanyl, and marijuana, among other controlled substances.  MMP's primary drug shops were at the BP gas station in the 5200 block of Windsor Mill Road (which was considered to be the gang's headquarters), and at the intersection of Gwynn Oak Avenue and Liberty Heights Avenue.  The drug shop in the 5200 block of Windsor Mill Road was particularly lucrative because of its close proximity to Interstate 70, which made it easily accessible to drug customers driving from western Maryland and neighboring states.  It was not unusual for MMP members and associates to sell over a kilogram of heroin per week at this location, which, at a retail price of $100 to $120 per gram, could translate to over $100,000 in drug revenue.  MMP members in both locations were required to pay dues to the gang's leaders whenever it was demanded of them, and they were subject to reprisal—and sometimes murder—for failing to do so.  Non-members who wished to sell drugs in MMP's

territories were forced to pay a "tax" or were targeted for violence, unless they had special approval from the gang's leaders.

MMP members, including BAILEY, used social media websites such as Instagram, Facebook, and YouTube to enhance the gang's status, assert MMP's claim to particular drug territories, intimidate rival gangs and drug traffickers, and enhance individual members' status within the gang. They commonly posted photographs and videos to these social media websites in which they flaunted firearms, drugs, or drug proceeds, and threatened harm to those who stood in the way of the gang.

At trial, the government presented evidence that BAILEY and his gang were responsible for five murders, six non-fatal shootings, multiple additional conspiracies to commit murder, assaults, and robberies, and at least six years of high-volume street-level drug trafficking.

### B. BAILEY's Criminal Activity in Furtherance of MMP

At trial, multiple witnesses testified that BAILEY was the founder, leader, and undisputed shot-caller of MMP. The government introduced hundreds of pages of MMP gang writings authored by BAILEY, as well as dozens of social media photographs of BAILEY making MMP gang signs. Additional evidence established that BAILEY ran the drug trafficking organization in the 5200 block of Windsor Mill Road; supplied heroin and crack cocaine to other members of the gang for distribution; extorted those who sold drugs in the area (members and non-members alike); and ordered and committed murders in order to eliminate rivals and witnesses and discipline members of the gang.

On October 15, 2012, BAILEY directed MMP member William BANKS to murder ███ because he was believed to be cooperating with law enforcement. BAILEY told BANKS that

MMP Boss Adrian Jamal SPENCE, a/k/a "Spittle," had put up money for hit.  BANKS shot ███

multiple times in the head and torso with a .45 caliber firearm outside the Club Mirage nightclub

in downtown Baltimore.  A bystander was also struck in the leg while attempting to flee.  A closed-

circuit television ("CCTV") camera captured the incident, and showed BAILEY arriving at Club

Mirage shortly before the shooting with William BANKS, Randy BANKS, Dontray JOHNSON,

Devon DENT, and James Edwards.  JOHNSON was wearing a red shirt with the words "MOBB

SQUAD" on the back, and he filmed the victim with a tablet device shortly before the shooting.

Gov. Ex. SF1, SF1a–n. ████████████████████████████████████

████████████████████████████████

BAILEY recounted the events surrounding the attempted murder of ███ in a semi-

autobiographical screenplay that investigators recovered from his residence at 7607 Reserve Circle

in Owings Mills, Maryland on May 17, 2016.  Gov. Ex. GP12G.  The screenplay, which was

introduced at trial, includes a scene in which BAILEY learns that ███ is "a rat" and a scene in

which ███ "gets hit" at "Club Mirage."  *See* Gov. Ex. GP12H.  In the scene where ███ gets shot,

BAILEY and "Dirt" (Randy BANKS) see ███ standing in line outside the club, and they decide

to "shut this bitch down" and "make it look like 4th of July."  *Id.*

In November 2012, BAILEY ordered the murder MMP member Antoine Ellis, a/k/a

"Poopy," because Ellis had joined BGF and was trying to "play both sides."  On Thanksgiving

Day 2012, Dontray JOHNSON shot Ellis to death in the field across the street from the BP gas

station in the 5200 block of Windsor Mill Road.  A few hours before the murder, JOHNSON had

posted a comment to his Facebook profile, "gbino2," that said: "**198 n risen**"—a reference to that

year's murder tally in Baltimore City, which he was about to increase by one.  *See* Gov. Ex. SM2,

at 20.  After the murder, BAILEY attempted to reward JOHNSON with $200 for his loyalty.  On November 24, 2012, at 2:12a.m., JOHNSON posted a Facebook comment that said: "**Nigga told me I'm one of the loyalist young nigga he knows then gave me a couple hunnid…I said what's this for he said for being u .started to give it back but I ain't want to b rude**."  In response, BAILEY, using Facebook profile "DantetheGreat," commented: "**Oh yeah**…"  *Id.* at 18–19.  ▮ testified at trial that BAILEY ordered Ellis's murder because Ellis had shown disloyalty to MMP by associating with the Black Guerilla Family (BGF).

On November 1, 2013, MMP members posted a rap video entitled "Boy You Lying" to the social media website YouTube, for the purpose of enhancing the gang's status, intimidating rivals, and discouraging anyone from selling drugs in the gang's territories without paying its members.  *See* Gov. Exs. YT1, YT1T.  The video stars BAILEY, William BANKS, and Dontray JOHNSON, who take turns brandishing a firearm with an extended magazine while rapping about killing people who do not "stay in line."  *See id.*  The video includes a skit in which a young drug dealer dressed in red takes a call from "Gutta" (*i.e.*, BAILEY) and promises him drug money, telling him he "just sold 100 packs today."  *Id.*  When BAILEY and several older males dressed in red arrive to collect the money, the young drug dealer claims he "ain't got that money."  BAILEY and the older males accuse him of lying and begin beating him.  *Id.*

On November 1, 2013, MMP members posted a rap video entitled "Str8 Mobbin" to YouTube for the purpose of enhancing the gang's status and asserting MMP's dominance over its drug territories.  *See* Gov. Exs. YT2, YT2T.  The video features BAILEY, William BANKS, Dontray JOHNSON, Randy BANKS, Adrian Jamal SPENCE, Takuma TATE, and other MMP members, as well as footage of MMP's drug territories at the intersections of Windsor Mill Road

and Forest Park Avenue, Gwynn Oak Avenue and Liberty Heights Avenue, Lauretta Avenue and Warwick Avenue, 27th Street and Boone Street, and Edmonson Avenue and Loudon Avenue. *Id.* In the opening scene, BAILEY takes a telephone call from William BANKS, who tells him that "nig**s talkin' about they run the city; it's time to turn up on these nig**s, man." BAILEY replies, "Say no more; just get the Mob together, and we gonna show these nig**s what it is." *Id.* The rap lyrics include references to killing people who stand in the way of the gang, and JOHNSON and another MMP member brandish actual firearms in the video. *See id.*

On February 8, 2015, BAILEY, William BANKS, Dominick WEDLOCK, and William JONES were at the BP gas station in the 5200 block of Windsor Mill Road. WEDLOCK confronted a group of three men who were pumping gas, and then asked BAILEY for a gun. BAILEY fired multiple shots at the three men with a .40 caliber firearm, causing them to flee. JONES slashed a tire on the victims' car before leaving the scene with WEDLOCK. *See* Gov. Exs. SF4, SF4a-o.

On February 12, 2015, in the 300 block of Collins Avenue, BAILEY murdered MMP member James Edwards, a/k/a "Bangout," using the same .40 caliber firearm he had discharged at the BP gas station on February 8, 2015. Several witnesses testified that BAILEY killed Edwards because he was showing disloyalty to MMP and making threats against its leaders. The jury found BAILEY guilty of VICAR murder based on this offense.

In February 2015, Dante BAILEY and Tiffany BAILEY filmed a video with Tiffany BAILEY's juvenile son. The three held hands while the juvenile son said, "Dear Lord, please kill all these snitches." Dante BAILEY and Tiffany BAILEY then said, "Amen." *See* Gov. Ex. IC132.

On or about April 23, 2015, near the intersection of Windsor Mill Road and Beverly Avenue, BAILEY and MMP member Altoneyo Edges, a/k/a "Chickenbox," possessed with intent to distribute approximately 21 grams of heroin. The drugs were recovered from a sweater belonging to BAILEY. *See* Gov. Exs. AP2a, AP2b. Edges attempted to take the charge for BAILEY, but could not accurately describe the quantity of drugs.

On April 25, 2015, in a recorded jail call, Dante BAILEY and his wife Tiffany BAILEY used coded language to discuss their heroin inventory. See Gov. Exs. J-16, J-16T.

On May 25, 2015, Dante BAILEY took a photograph of himself holding a Sturm, Ruger & Co. 9mm caliber firearm with an extended magazine. *See* Gov. Ex. IC66.

On June 12, 2015, Kenneth TORRY sent a text message to Dante BAILEY asking when BAILEY would be ready with the payment for 100 grams of heroin that had been provided to him on consignment. In a reply text message, BAILEY indicated that he would not be able to sell off the heroin until the police presence in the area died down. Bailey stated: "It's scorching. He can get this hundon back until it cool down. When I'm done I will take u to c the president." *See* Gov. Ex. CELL14a, at 10–11.

On June 18, 2015, in the 1900 block of Forest Park Avenue, Dante BAILEY possessed with intent to distribute approximately 33 grams of marijuana. As he was being arrested, BAILEY instructed Ivan Potts, a/k/a "Spotty," that he needed to take the marijuana charge for him. Potts then advised police that the marijuana in BAILEY's vehicle belonged to him. Baltimore Police officers also recovered a loaded handgun from the wheel well of a nearby vehicle. In a wiretap call between BAILEY and Adrian Jamal SPENCE after the arrest, BAILEY indicated to SPENCE that he knew the gun was there. *See* Gov. Ex. WIREB, Call B-912.

9

On July 3, 2015, Tiffany BAILEY possessed with intent to distribute approximately 26 grams of heroin and 21 grams of cocaine base.  Later that day, members of the Baltimore County Police Department executed a search warrant at the BAILEYS' residence at 3901 Princely Way in Pikesville, Maryland.  The officers recovered drug packaging material, a money counter, MMP gang paperwork, a loaded Smith & Wesson .357 caliber firearm (serial number CNW4373), and a loaded Beretta 9mm caliber firearm (serial number BER421485Z). ███████████

████████████████████████████████████████████████████

███████████

On July 4, 2015, Dante BAILEY made a series of recorded jail calls to Jay GREER from the Baltimore County Detention Center.  In the first call, BAILEY reprimanded GREER for failing to take the gun charge for him the previous day.  BAILEY also instructed GREER to continue mixing drugs together while he was locked up and "get everybody together and make 'em push everything."  GREER told BAILEY that Adrian Jamal SPENCE had "front[ed]" drugs to him the day before and that he was going to "try to help get some of that cheese together" to "pay[] for the bills."  GREER also informed BAILEY that the search warrant paperwork left at BAILEY's residence said "something about a CI [*i.e.*, confidential informant]."  *See* Gov. Exs. J-18, J-18T, J-19, J-19T, J-20, J-20T.

In subsequent recorded jail calls the same day, BAILEY advised Kenneth TORRY that he would continue to work through Adrian Jamal SPENCE and his wife (Tiffany BAILEY) from jail. BAILEY instructed TORRY to collect $700 from the members of the organization and give it to Tiffany BAILEY so that she could pay for his bail.  BAILEY also instructed TORRY to supply Jay GREER with 200 grams of heroin on consignment.  When TORRY expressed reluctance,

BAILEY said, "How you going to dictate what I do with my business?"  TORRY then agreed to supply 100 grams of heroin to GREER and another 100 grams of heroin to BAILEY when he was released from jail.  In a later call, BAILEY informed GREER that TORRY was about to give GREER 100 grams of heroin, which would amount to at least "ten bands" (*i.e.*, $10,000).  BAILEY said "ain't no excuse" and asked, "You understand what we in?"  GREER said he understood.  *See* Gov. Exs. J-21, J-21T, J-22, J-22T.

On July 7, 2015, in wire call B-2535, Adrian Jamal SPENCE told BAILEY that he had heard "somebody might be tryin' to set me up or something."  BAILEY asked whether SPENCE wanted "to turn it up."  SPENCE told BAILEY "it could be anybody."  BAILEY again offered "turn it up" on "whoever" SPENCE thought it might be.  *See* Gov. Ex. WIREB.

On July 20, 2015, law enforcement officers executed a search warrant at 532 Coventry Lane, a stash house that SPENCE used to store and package heroin he supplied to other members and associates of MMP, including BAILEY.  There, they recovered approximately 608 grams of heroin and a kilogram press used to compress heroin and adulterants into kilogram bricks.  *See* Gov. Exs. SW2a-i.

On July 21, 2015, in a recorded jail call, BAILEY ordered MMP member Altoneyo Edges, a/k/a "Chickenbox," who was incarcerated in the Baltimore City Detention Center, to assault another inmate as retaliation for cooperating with law enforcement against Dontray JOHNSON. BAILEY told Edges: "You supposed to slap the shit out shorty. . . . Punish that nig**, yo!  Punish that nig**!"  Edges agreed to carry out the assault.  BAILEY said, "I got you.  I'll send you a money order. . . . Destroy that nig**, yo!"  *See* Gov. Exs. J-24, J-24T.

On July 22, 2015, at the BP gas station in the 5200 block of Windsor Mill Road, BAILEY, now-deceased BGF member Dominick Kane, a/k/a "Fish," and Ivan Potts, a/k/a "Spotty," attempted to murder ██ .  BAILEY engaged ██ in conversation while Kane and Potts approached in a vehicle and shot ██ multiple times in the back and legs.  In response, ██ 's associates returned fire from another vehicle and hit Maurice POLLOCK, a/k/a "Reese," and now-deceased MMP member Brian Johnson, a/k/a "Nutty B." ████████████████████ ████████████████████████████████████ ██ was hospitalized with multiple gunshot wounds, and a photograph of his injuries was introduced at trial.  *See* Gov. Ex. CS4-25.

On July 23, 2015, in a recorded telephone call, Adrian Jamal SPENCE told Jarmal HARRID what had happened at the BP gas station the previous night.  SPENCE explained that "there was a nig** out there with the jeans and shit" (referring to ██ ), and "Big Man" (*i.e.*, BAILEY) and them was tryin' to really fix him up," but "while they fixin' him up," the "nig*as that was with him" began shooting back and "hit Reese and Nutty."  SPENCE added: "It was basically a shootout, for real.  . . . Nig**s was really dumpin', for real."  SPENCE also advised HARRID that around ten minutes before the shootout, members of MMP had assaulted another individual, D.S., because he was selling drugs on their turf.  As SPENCE described it: "Nig**s knocked yo out.  Whole jaw was hanging in a big-ass puddle of blood."  *See* Gov. Ex. WIREG, Call G-232.

Between in July 2015 and April 2016, BAILEY attempted to recruit another inmate at the Baltimore County Detention Center to join MMP.  In undated papers recovered from the inmate's jail cell on April 8, 2016, BAILEY wrote: "The science behind being 25% Piru 75% MOB is a

representation of our roots which is Piru & our bloodline which is Mafia.  EMM$ come before all.
M1 P2, I will murder you for Piru."  *See* Gov. Ex. GP11a.  BAILEY also recounted the history of
MMP, beginning with its creation on March 2, 2009, when "Bad Guy," who was an "OOOG of
TTP," set out "to separate the real brothers from the fake" after "the Don of Tree Top told the Feds
on his brothers."  *Id.*  BAILEY continued: "In 2010, Bad Guy & Wolf [BAILEY] finally reunited
in USP Lee County & the structure of the MOBB was put into effect.  . . . Bad Guy & Wolf made
history together for the MOBB by smashing the New York & New Jersey Blood sets in USP Lee,
sending a message to the Bloods on the East Coast that we, Murdaland Mafia, run Murdaland."
*Id.*  BAILEY explained that by 2012, "Mobsters had taken over Greenmount and Ilchester, 27th
and Boone, Lauretta & Warwick, & a part of North & Pulaski."  *Id.*  BAILEY also wrote about
tattoos MMP members could earn: an "M" for "taking the Mafia oath," a lightning bolt for "killing
for the MOB," a "pink rose" for a "Mafia wife," a "badge of honor" for a "Made Man," a "wolf
imprint" for a "direct descendant of Werewolf, who has killed," or a "Mafia shield" for a "Capo
of the MOBB."  *Id.*

On August 10, 2015, a third party published a rap video and interview with BAILEY to the
social media website YouTube.  *See* Gov. Exs. YT14, TY14T.  The rap video featured BAILEY,
Jamal LOCKLEY, William JONES, Dwight JENKINS, William BANKS, and other MMP
members wearing items of red clothing and making gang signs at the intersection of Windsor Mill
and Forest Park.  In the interview following the rap video, BAILEY described his crew at Forest
Park and Windsor Mill, explaining: "You get out of line, you get ran over. ***We got teams for money
and murder***. . . We get money.  If y'all ain't doin' it, you get lost."

On August 14, 2015, in a recorded jail call, William JONES told Melvin LASHLEY that people were paying him respect in jail because of his membership in MMP.  JONES said: "Nig\*\*s really respect our Mob in here . . . And the first thing they say is, 'Yo, you know that—what's that big nig\*\* name with the tattoos, yo?  Gutta [*i.e.*, BAILEY]—that's him.' Nig\*\*s really scared of him."  *See* Gov. Exs. J-28, J-28T.

On August 23, 2015, in a recorded jail call, a female MMP associate advised Adrian Jamal SPENCE that BAILEY was "sending threats and sh\*\*, talking about nig\*\*s got to give up $150 every week."  *See* Gov. Exs. J-29, J-29T.

On September 29, 2015, Dontray JOHNSON murdered MMP member Brian Johnson, a/k/a "Nutty B," because he refused to pay gang dues JOHNSON was collecting for BAILEY.  A few hours after the murder, JOHNSON visited BAILEY at the Baltimore County Detention Center and recounted what happened.  In a recorded conversation, BAILEY approved the murder, saying "***I told you about this . . . Blow a fucking head off! Blow another nigga's head off! I said I'm through. . . . Don't play with 'em. Make 'em scared!***"  *See* Gov. Exs. J-34, J-34T.  JOHNSON assured BAILEY he would continue enforcing the gang dues and ordering MMP members to "***kick that money out***."  *Id.*  BAILEY instructed JOHNSON to "holler at Randy [BANKS] and tell him we raising the fourth generation. . . . ***We going at everybody. . . . We ain't fu\*\*ing with nothing***."  *Id.*  BAILEY also promised to put together a list of "who is who" in the gang and give it to JOHNSON and Randy BANKS.  *Id.*  ▮▮▮▮▮▮▮ testified about the murder at trial.  They explained that JOHNSON killed "Nutty B" because BAILEY had instructed him to kill anyone who did not pay gang dues.

On April 28, 2016, BAILEY and LOCKLEY armed themselves and went looking to retaliate against members of a rival drug organization they believed were responsible for killing MMP member Maurice Braham, a/k/a "Mookie."   BAILEY and LOCKLEY drove to the rival drug organization's territory, where BAILEY observed Anthony Hornes, who BAILEY suspected—wrongly—had been involved in Braham's murder.  BAILEY shot Hornes in the head, killing him.  LOCKLEY was the getaway driver. ███████████████████████████

███████████████████████████████████████████████████████ the government presented cell site location data showing that the cell phones in use by LOCKLEY, BAILEY, ██████ were █ in the vicinity of the murder at the approximate time of the murder. *See* Gov. Ex. CLSI2.  The government also played a recorded jail call from MMP member Darius Stepney, a/k/a "Conehead," to a co-conspirator on April 29, 2016, the day after the Hornes murder. During the call, the co-conspirator indicated that "Gutta [*i.e.*, BAILEY] and them" had committed the Hornes murder as retaliation for Braham's murder.  The co-conspirator even read a newspaper clipping about the murder, saying: "It say 4700 block of Haddon, 34-year-old Anthony Hornes of the 3800 block of Ferndale suffered from a gunshot wound, pronounced deceased by the doctors." *See* Gov. Exs. J-56, J-56T.

As it turned out, Hornes had nothing to do with the murder of Maurice Braham.  His wife reported that Hornes had spent the day at Yellow Cab training for a job and the evening at home with her and her children.  He walked to the store to buy cigarettes and never returned.  He was simply in the wrong place at the wrong time, gunned down in a senseless act of violence.

On May 3, 2016, Dante BAILEY and Tiffany BAILEY went to an indoor shooting range, where they purchased 150 rounds of ammunition and rented a Ruger .22 caliber firearm (serial

number 363-75990), a Springfield .45 caliber firearm (serial number MG500105), and a Beretta 9mm caliber firearm (serial number BER659285).  *See* Gov. Exs. SF8a-d, SF9a-c.  Dante BAILEY posted a video of himself firing one of the handguns to his Instagram account with the comment "ALMIGHTY LIFE [emojis of revolvers, explosions, 1000] BLACK BLOOD BROTHERHOOD."

On May 17, 2016, ATF agents executed a search warrant at Dante BAILEY's residence at 7607 Reserve Circle in Owings Mills, Maryland.  ATF agents recovered approximately 94 grams of heroin; letters between BAILEY and other MMP members discussing MMP business; an autobiographical screenplay featuring the members of MMP and describing acts of violence very similar to ones MMP members are known to have carried out; and a handwritten note containing the MMP oath and a list of disciplinary actions for "Level 1," "Level 2," and "Level 3" violations. *See* Gov. Exs. GP12a-i.

In the early morning hours of August 10, 2016, Sydni FRAZIER and one or more co-conspirators abducted, bound, robbed, and murdered Ricardo Johnson, a/k/a "Uncle Rick," and then attempted to set his body on fire.  Later that day, FRAZIER fled from police and discarded the two murder weapons—a Smith & Wesson 9mm caliber firearm (serial number HAE0456) and a Taurus 9mm caliber firearm (serial number TJN73204)—as well as a pair of gloves that were found to have FRAZIER's DNA on the inside and the victim's DNA on the outside. ▮ testified that BAILEY authorized Johnson's murder based on a belief that he was cooperating with law enforcement. ▮ testified that FRAZIER carried out the murder because he wanted to rob Johnson of his drug stash.

On August 19, 2016, in a recorded jail call, BAILEY and LOCKLEY conspired to murder ███ based on a belief that he was cooperating with law enforcement in a federal case against MMP Boss Adrian Jamal SPENCE.  *See* Gov. Exs. J-65, J-65T.  BAILEY called unindicted co-conspirator Michael Singer, a/k/a "Blizz," who was at a recording studio with LOCKLEY at the time of the call.  During the call, BAILEY advised LOCKLEY that ███ was no longer "part of the team" because he was cooperating with law enforcement officers in a federal case against the gang.  BAILEY explained: "***Spittle [i.e., SPENCE] said, in his paperwork, that*** ███ ***who they said is the CI***."  LOCKLEY reacted incredulously, saying, "***What?!***"  LOCKLEY then dialed a third party known as "Granny," who confirmed what BAILEY had said about ███.  LOCKLEY told BAILEY, "***That's real, huh?***"  BAILEY replied "***Yeah.***"  BAILEY then directed LOCKLEY to send ███ to Lamar Stephens a/k/a "M-Easy," who several witnesses testified was a known hitman for the gang.  LOCKLEY agreed, saying, "***Alright. Say no more***."  BAILEY emphasized that ███'s cooperation was "***still occurring now***" and "***this shit is not a game no more***."  LOCKLEY said, "***Right***."  Singer piped up, saying he did not want ███ to be killed at the studio because it would jeopardize his relationship with the studio's owners: "***I don't want nothing to go down at the studio yo because . . . that's gonna put this on the line.  I ain't even gonna lie to you with the people that own this place.***"  BAILEY agreed, saying, "***Nothing goes down at the studio***."

In the same conversation, BAILEY joked with LOCKLEY about the recent murder of Ricardo Johnson.  Specifically, BAILEY said, "I heard about your uncle"—a reference to Johnson, a/k/a "Uncle Rick."  LOCKLEY replied, "Oh yeah?"  This prompted hilarious laughter.  BAILEY added: "He was trying to catch the light rail"—a reference to the fact that Johnson's body had been found by the light rail tracks.  *See* Gov. Exs. J-65, J-65T.

17

On or about September 29, 2017, BAILEY directed co-conspirator Kevin Forrest, a/k/a "Hollywood" to have ███ murdered because BAILEY believed (correctly) that ███ was cooperating with federal law enforcement against MMP.   BAILEY arranged for the hit by exchanging letters with a female inmate at Northern Neck Regional Jail.   During a search of the female inmate's jail cell, law enforcement officers recovered many of these letters, which were written in BAILEY's distinctive handwriting and signed by him.   In one letter, BAILEY wrote: "I need you to send a letter to Hollywood & give him this address [address redacted]. Tell Hollywood to give this address to Crazy. Tell him to tell Crazy to ██████████████████."   *See* Gov. Ex. GP16a. ████████████████   The address BAILEY provided was a known (former) address of ███'s.   "Crazy" is the known alias of Malik Thompson, who was identified by multiple witnesses (including ███) as a hitman for BAILEY.   BAILEY also provided the female inmate with Hollywood's legal name—Kevin Forrest—and the address of his residence in Baltimore.   *See* Gov. Ex. GP16b.   The evidence established that the letter was an instruction to Forrest to have Thompson kill ███ to prevent him from testifying in the case.

On October 2, 2017, the ATF executed a search warrant at Forrest's residence in Baltimore. ATF agents recovered three loaded firearms, roughly two hundred rounds of ammunition, Forrest's iPhone, and the "hit" letter from the female inmate at NNRJ.   *See* Gov. Exs. SW11a-z.   The hit letter stated: "Hollywood, How are you? My name is [name redacted]. Im Gutta's friend. I was told to give you this address [address redacted].   Give this address to Crazy & tell him to ████ ████████████████"   *See* Gov. Ex. GP17.   As they were executing the search warrant, ATF agents observed that Forrest's iPhone showed a "missed call" from a contact saved as "Crazy Homey"—believed to be Malik Thompson, the intended hitman.   *See* Gov. Ex. SW11y.

18

Furthermore, a search of Forrest's iPhone revealed that he purchased one of the recovered firearms through a straw purchaser shortly after the hit letter was sent.  *See* Gov. Ex. SW11z.

In an undated letter, BAILEY wrote to an unknown MMP member, advising him that he had "failed to follow the protocol" and that, "for the next 90 days I will keep a close eye on you." BAILEY went on to explain: "Everyone who says the Omerta Code is royalty.  That is not for everyone anymore. When your cheeks get kissed, you become a Made Man. . . . You are a Made Man who runs his own table now. This means you need a U.B. [Under Boss], a Capo, & a LT [Lieutenant].  . . . Those 3 positions become Made Men also. You must kiss there [sic] cheeks. They must be able to spit the 2 M's."  In a postscript to the letter, BAILEY wrote: "Fu\*\* this case. No matter what happens, I'll still be a legend."  *See* Gov. Ex. GP12b.

### C.  Recent Criminal Activity

BAILEY's criminal activity has continued unabated throughout his pretrial detention and since being convicted.  He has attempted to obstruct justice, cause harm to witnesses, spur other gang members to violence, and run a drug smuggling operation in CDF.  Not only has he failed to accept responsibility for his crimes, he has not shown any hint of remorse.

In a jail call on January 6, 2019, at 9:57 p.m., roughly nine weeks before trial was to begin, BAILEY instructed his wife and co-defendant Tiffany BAILEY to assault a woman he suspected of cooperating against him.  BAILEY asked Tiffany to go online and find out where "Bino" (*i.e.*, MMP Boss Dontray JOHNSON) was being housed.  BAILEY indicated that he wanted to get in touch with JOHNSON to discuss a suspected cooperator named ████████████████ █████████████████████████ (████ was not, in fact, a witness for the government.) BAILEY said he believed ████ was providing information about the murder of James Edwards

a/k/a "Bangout" because ▮ name appeared in the homicide file.  Tiffany told BAILEY the Bureau

of Prisons (BOP) website indicated JOHNSON was not in BOP custody yet, and his projected

release date was "11/20/2041."  Tiffany also mentioned that ▮ had been contacting her about

meeting up.  BAILEY instructed Tiffany to bring harm to ▮, saying: "***You should smack the***

***shit out shorty! You should smack [inaudible]!***"  BAILEY also stated that he would soon get the

rest of his paperwork, and, "***All those people who said anything—they can't hide no more***."  A

transcript of the relevant portion of this call is attached as Exhibit 1.

In a jail call April 28, 2019 at 6:33 p.m., three days before the jury verdict, BAILEY talked

to MMP Altoneyo Edges, a/k/a "Chicken Box," about smuggling drugs into the jail for him.  Edges

said his source had a "10-piece."  BAILEY asked why Edges could not get a "50-piece."  Later in

the call, Edges initiated a three-way call with Chiquetta Heath, a/k/a "Bandi."  Heath complained

that another MMP member named "Kev" was "rocking with" a female named "Flame" who was

threatening Heath and her children.  BAILEY became irate and said he would "handle" the

situation.  BAILEY then instructed Edges to initiate a three-way call with "Kev."  BAILEY

confronted "Kev" about Heath's accusation, saying: "***There's some broad that's supposed to be***

***looking for [Heath], and you're rockin' with the broad.  Is this true?***"  "Kev" denied that he was

"riding with the other side."  After "Kev" hung up, BAILEY expressed skepticism about "Kev's"

denial.  A transcript of the relevant portion of this call is attached as Exhibit 2.

In a subsequent call at 7:12 p.m., BAILEY reprimanded Edges for failing to come to

Heath's defense and take action against "Kev" and "Flame."  BAILEY instructed Edges to "***go***

***find [Kev], and show him how he in violation***."  BAILEY also instructed Edges to "look for" the

female who had been threatening Heath ("Flame"), saying, "***It's your obligation to fix her, to***

*discipline her.*"   At other points in the conversation, BAILEY reminded Edges that they "***took a motherfucking pledge, they pledge[d] allegiance to something together***," and it was "***one of the major . . . rules***" to come to an MMP brother or sister's defense when threatened by an outsider. Edges told BAILEY he knew what BAILEY was saying but did not "***wanna say everything on the fucking phone***."   A transcript of the relevant portion of this call is attached as Exhibit 3.

On or about May 7, 2019, six days after BAILEY was found guilty, a jail missive or "kite" was intercepted from BAILEY to another inmate at the Chesapeake Detention Center (CDF) named Bernard Bey.   In the kite, BAILEY used coded language to tell Bey that he wanted to purchase a 7-inch strip of synthetic marijuana or "K2" for $100, and asked Bey to send him details about how to transfer the money via Cash App.   BAILEY also asked Bey to "send more" contraband, because he could "move it" in the jail.   A copy of the kite is attached as Exhibit 4.

On or about May 8, 2019, a reply kite was intercepted from Bey to BAILEY.   The kite included a long, thin strip of black paper soaked in liquid K2.   Bey gave BAILEY a phone number to call in order to provide the $100 via Cash App, and provided his pricing scheme for K2 in the jail.   A photograph of the kite and the K2 strip is attached as Exhibit 5.

Later that week, another kite was intercepted from BAILEY to Bey.   BAILEY requested that Bey send him more K2 because he had "people lined up" in the jail.   BAILEY added ominously: "Also, my brother said something about something as far as hollering at somebody. Let me know what you need and I got that…"   A copy of the kite is attached as Exhibit 6.

## II. DISCUSSION

### A. <u>Standard of Proof at Sentencing</u>

Unlike a jury's verdict, which must be based on proof beyond a reasonable doubt, the standard of proof for findings of fact at sentencing is a simple preponderance of the evidence. *See, e.g.*, *United States v. Grubbs*, 585 F.3d 793, 798–803 (4th Cir. 2009); U.S.S.G. § 6A1.3, Cmt. ("[U]se of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case."). Furthermore, a sentencing court may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 154 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."); *Rita v. United States*, 551 U.S. 338, 352 (2007) (noting that "many individual [Sentencing] Guidelines apply higher sentences in the presence of special facts," and "[i]n many cases, the sentencing judge, not the jury, will determine the existence of those facts"); *Witte v. United States*, 515 U.S. 389, 399–401 (1995); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 361 (1984); *Grubbs*, 585 F.3d at 798–800 (collecting cases).

### A. <u>Advisory Sentencing Guidelines Calculation</u>

The relevant guideline for a violation of 18 U.S.C. § 1962(d) is U.S.S.G. § 2E1.1, which provides that the base offense level is the greater of 19, or "the offense level applicable to the underlying racketeering activity." The application notes further explain: "Where there is more

than one underlying offense, treat each underlying offense as if contained in a separate count of conviction." U.S.S.G. § 2E1.1, App. Note 1.

Here, the jury unanimously determined that murder, extortion, conspiracy to distribute drugs, distribution and possession with intent to distribute drugs, witness tampering, and witness retaliation were racketeering activities that were reasonably foreseeable to BAILEY in furtherance of the racketeering conspiracy. As described below, we calculate the guidelines slightly differently than they are calculated in the Presentence Investigation Report, but we ultimately end up in the same place: BAILEY's total offense level is 43+, and the advisory guidelines sentence is life imprisonment.

### 1.    Count 1/Group 1—Attempted Murder of ▇▇▇

The base offense level is 33 pursuant to U.S.S.G. § 2A2.1(a)(1) because the object of the offense would have constituted first-degree murder. There is a 4-level upward adjustment under to U.S.S.G. § 2A2.1(b)(1)(B) because "the victim sustained permanent or life-threatening bodily injury." As discussed above, ▇▇▇ was shot numerous times in the head and torso at close range with a .45 caliber firearm. There is another 4-level upward adjustment pursuant to U.S.S.G. § 2A1.5(b)(2) because the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Finally, there is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct. As discussed above, the government proved that BAILEY

directed the murder of ▮ on August 19, 2016, and directed the murder of ▮ on September 29, 2017, because he believed (correctly) that ▮ and ▮ were cooperating with federal law enforcement officers against MMP.   Based on this evidence and other evidence, the jury unanimously determined that witness tampering and witness retaliation were reasonably foreseeable racketeering activities to BAILEY.  The adjusted offense level is **43**.

### 2.   Count 1/Group 2—Murder of Antoine Ellis, a/k/a Poopy

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.  There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level for this group is **45**.

### 3.   Count 1/Group 3—Murder of James Edwards, a/k/a Bangout

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.  There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level for this group is **45**.

### 4.   Count 1/Group 4—Attempted Murder of ▮

The base offense level is 33 pursuant to U.S.S.G. § 2A2.1(a)(1) because the object of the offense would have constituted first-degree murder.  There is a 4-level upward adjustment under

to U.S.S.G. § 2A2.1(b)(1)(B) because "the victim sustained permanent or life-threatening bodily injury."   As discussed above, ███ was shot numerous times in the back and legs and was hospitalized with serious injuries.   There is also a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.   The adjusted offense level is **37**.

### 5.   <u>Count 1/Group 5—Murder of Anthony Hornes</u>

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.   There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.   The adjusted offense level for this group is **45**.

### 6.   <u>Count 1/Group 6—Murder of Ricardo Johnson, a/k/a Uncle Rick</u>

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder.   There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.   The adjusted offense level for this group is **45**.

### 7.    Counts 1 & 2/Group 7—Drug Trafficking

The base offense level is 30 pursuant to U.S.S.G. § 2D1.1(c)(5) because the jury found that it was reasonably foreseeable to BAILEY that at least 1 kilogram of heroin and 280 grams of crack cocaine would be distributed in furtherance of the drug trafficking conspiracy, and combining these quantities using the drug equivalency tables results in approximately 2,000 kilograms of "converted drug weight."

There is a 2-level upward adjustment pursuant to U.S.S.G. § 2D1.1(b)(1) because a dangerous weapon was possessed.  There is another 2-level adjustment pursuant to U.S.S.G. § 2D1.1(b)(2) because the defendant used violence, made a credible threat to use violence, or directed the use of violence.  There is a further 4-level upward adjustment pursuant to U.S.S.G. § 3B1.1(a) because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  Finally, there is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.  The adjusted offense level is **40**.

### 8.    Total Adjusted Offense Level for All Groups

The total offense level for Group 1 (43), Group 2 (45), Group 3 (45), Group 4 (37), Group 5 (45), Group 6 (45), and Group 7 (40) is **50**.  *See* U.S.S.G. §§ 3D1.2, 3D1.3, 3D1.4, 5G1.1.  As noted in the Presentence Investigation Report, there are other groups of racketeering activity—for instance, the attempted murder of three men at the BP gas station on February 8, 2015 (PSR ¶¶ 98–103), the conspiracy to assault an inmate as retaliation for cooperating with law enforcement on

26

July 21, 2015 (PSR ¶¶ 104–109), the conspiracy to murder ███ on August 19, 2016 (PSR ¶¶ 110–115), and the conspiracy to murder ███ on September 29, 2017 (PSR ¶¶ 116–121). However, none of these groups impact the total offense level because they are all nine or more levels less serious than the most serious group under U.S.S.G. § 3D1.4.

### 9.   Count 3—VICAR Murder of James Edwards, a/k/a Bangout

The base offense level is 43 pursuant to U.S.S.G. § 2A1.1(a) because the offense was first-degree murder. There is a 2-level upward adjustment pursuant to U.S.S.G. § 3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and relevant conduct. The adjusted offense level for this group is 45.

### 10.   Count 17—Possession of Firearms by a Felon on May 3, 2016

The base offense level is 20 pursuant to U.S.S.G. § 2K2.1(a)(4)(A) because BAILEY committed the instant offense subsequent to sustaining one felony conviction for a crime of violence, specifically, Robbery with Deadly Weapon in Baltimore City Circuit Case No. 597120012. This group does not impact the total offense level because it is nine or more levels less serious than the most serious group under U.S.S.G. § 3D1.4.

### 11.   Count 18—Possession with Intent to Distribute Heroin on May 17, 2016

The base offense level is 22 pursuant to U.S.S.G. § 2D1.1(c)(9) because the offense involved at least 80 grams but less than 100 grams (specifically, approximately 94 grams) of heroin. This group does not impact the total offense level because it is nine or more levels less serious than the most serious group under U.S.S.G. § 3D1.4.

### 12. **The Defendant is Not Entitled to a Downward Adjustment for Acceptance of Responsibility**

Although defense counsel argues that BAILEY has accepted responsibility, it is completely belied by his conduct.  As recently as August 20, 2019, he denied having any involvement in the murder of James Edwards in a publically filed letter.  *See* Exhibit 7.  Furthermore, as discussed above, from the date of his incarceration in this case up until at least May 2019, BAILEY continued to engage in the same pattern of racketeering activity—attempting to bring harm to witnesses and rivals, obstructing justice, and trafficking dangerous drugs in the detention facility where he was housed.  There can be no doubt that he has not accepted responsibility as is required by U.S.S.G. § 3E1.1.

### 13. **Criminal History Category**

The government agrees with U.S. Probation that BAILEY is in criminal history category V with 12 criminal history points.

### 14. **Guidelines Ranges and Statutory Maxima**

The government's position is that the total offense level for Counts 1, 2, 3, 17, and 18 is **50**, resulting in a total punishment of **life imprisonment**.  *See* U.S.S.G. §§ 3D1.2, 3D1.3, 3D1.4, 5G1.1.  The applicable guideline for Count One (50/V) is **life imprisonment**.  The applicable guideline for Count Two (40/V) is **360 months to life imprisonment**.  The applicable guideline for Count Three (45/V) is **life imprisonment, and this sentence is mandatory by statute**.  The applicable guideline for Count Seventeen (20/V) is **63 to 78 months imprisonment**, and the statutory maximum is **10 years**.  The applicable guideline for Count Eighteen (24/V) is **92 to 115 months imprisonment**, and the statutory maximum is **20 years**.

### B. <u>Count Three Carries a Mandatory Life Sentence</u>

Contrary to defense counsel's arguments, murder in aid of racketeering carries a mandatory sentence of death or life imprisonment. The statute provides, in relevant part, that an individual convicted of such a murder "shall be punished . . . by death or life imprisonment, or a fine under this title, or both." 18 U.S.C. § 1959(a)(1). In *United States v. Under Seal*, 819 F.3d 715, 717 (4th Cir. 2016), the Fourth Circuit held that violations of § 1959(a)(1) "carr[y] a mandatory statutory penalty of either death or life imprisonment." In doing so, the Court grappled with and rejected the exact argument defense counsel advances. The Court reasoned:

> As § 1959(a)(1) reflects, a person convicted of murder in aid of racketeering is also subject to a fine. However, we do not believe Congress intended a fine to be a stand-alone penalty for committing this offense. Rather, we agree with the Second Circuit's analysis in *United States v. James*, 239 F.3d 120 (2d Cir. 2000), which observed that it would be "deeply problematic" for Congress to have authorized a penalty of a fine only as an alternative to "death or life imprisonment," and that this cannot have been what Congress intended. As such, the better construction of this statute is that it authorizes a fine in addition to either "death or life imprisonment." *Id.* at 126–27; *see also United States v. Mahdi*, 598 F.3d 883, 897 n. 13 (D.C. Cir. 2010) (reaching this same "common sense conclusion").

*Id.* at 717 n.5. As noted in the Fourth Circuit's opinion, the Second Circuit and the D.C. Circuit have reached the same conclusion. *See also United States v. Rollness*, 561 F.3d 996, 997–98 (9th Cir. 2009) (joining the Second and D.C. Circuits in holding that § 1959(a)(1) imposes a minimum term of imprisonment of life for VICAR murder). The government is not aware of any Circuit Court that has reached a different result.

It is misleading to suggest that Judge Bredar ruled that § 1959(a)(1) gives the sentencing court authority to impose a sentence other than death or life in prison. When Judge Bredar made the comments quoted in defense counsel's memorandum, he had not yet been pointed to the Fourth Circuit's decision in *Under Seal*. When made aware of the ruling, Judge Bredar stated that it was

"generally a safe strategy" to follow Fourth Circuit precedent and that he would "look at the case." ECF 1312-4, at 34–36. Because Judge Bredar found that life imprisonment was the appropriate sentence under 18 U.S.C. § 3553, it was not necessary for him to decide whether § 1959(a)(1) permitted any other result. His ruminations on the matter are classic dicta.

In any event, even if the plain language of the statute permits imposition of a fine instead of a sentence of death or life imprisonment, it does *not* permit the result defense counsel is seeking—*imposition of a term of years less than life*. The three options would be: (a) death, (b) life, or (c) a fine. There is no fourth option. No judge, including Judge Bredar, has ever found that there is. For all these reasons, the Court should reject defense counsel's request that the Defendant be sentenced to a term of imprisonment of 40 years on Count Three.

### C. <u>Analysis of Factors Under 18 U.S.C. § 3553</u>

It is hard to imagine more serious conduct, a more violent defendant, and a more compelling need for protecting the public and promoting respect for the law. Dante BAILEY founded and led a brutally violent street gang that was responsible for at least five murders, six attempted murders, and multiple additional conspiracies to commit murder, assaults, extortion, witness tampering, and witness retaliation. Its members built an economy based wholly on the trafficking of deadly drugs. And to protect that way of life, they threatened and intimidated those who would testify against them. Through these activities, MMP devastated neighborhoods in Northwest Baltimore. They left grieving families and wounded victims in their wake. They intimidated witnesses and profited from the scourge of addiction. Individually and as a group, they acted without regard for human life and with contempt for our system of justice. They left behind a legacy of fear, misery, and contempt for the rule of law.

No lawyer's rhetoric can capture the seriousness of BAILEY's crimes.  The evidence, however, speaks for itself.  By the time it imposes sentence, the Court will have presided over twenty guilty plea hearings, twenty-one sentencings, and six weeks of trial, during the course of which dozens of victims, co-conspirators, investigators, experts, and ordinary citizens have exposed the truth about BAILEY and MMP.

The truth is that BAILEY relished his role as the leader and shot-caller of MMP.  He fully embraced MMP's culture of murder and obstruction of justice.  He wanted nothing more than to gain notoriety as a dangerous crime boss.  He ordered members of MMP to commit murders in order to retaliate against rivals, eliminate potential informants against the gang, and impose discipline within the gang.  He committed murders with his own hand.  He distributed large volumes of heroin and crack cocaine in the gang's territories in Northwest Baltimore.  He bragged about how he was able to cash in on addiction and suffering—referring to his customers as "junkies" and "fiends."  He indoctrinated a generation of youths from his neighborhood into a life of crime and senseless violence.   After he was arrested, he continued to conduct the gang's affairs from behind bars, ordering hits on rivals and witnesses, and plotting various ways to obstruct justice.  He has showed absolutely no remorse for his offenses and no intention of stopping his criminal activity.  He continues to present a grave danger to the public.

BAILEY has a long and extremely serious criminal history that runs the gamut of drug crimes, violent crimes, property crimes, and handgun offenses.  He has Maryland state convictions for Possession with Intent to Distribute Cocaine in 1994 (as a juvenile); Handgun Wear/Carry in 1995; Reckless Endangerment in 1996; Robbery with a Deadly Weapon and Handgun on Person in 1997; Second Degree Assault in 2002; and Deadly Weapon Conceal in 2002.  BAILEY also has

a previous *federal* felony conviction.   On November 5, 2004, BAILEY was convicted of possession of a firearm by a convicted felon in the United States District Court for the District of Maryland (Case No. WDQ-05-0254) and sentenced to 86 months in prison.   The stipulation of facts in the plea agreement indicates that on March 2, 2004, BPD officers were in the 5200 block of Windsor Mill Road when they were notified by several people that BAILEY was in the playground of Dickey Hill Elementary School assaulting a woman.   The officers responded to the school and observed BAILEY standing in the playground and a woman, approximately 10 yards away, crying.   BAILEY resisted a command to place his hands over his head and fled from the officers.   As he fled, he pulled out a loaded 9mm caliber pistol.   He was apprehended when he tripped and fell, dropping the firearm.

BAILEY attempts to excuse away these crimes in his sentencing letter of August 20, 2019, blaming them on a childhood trauma, abuse, and lack of positive role models.   *See* Exhibit 7.   But this description is at odds with a letter he wrote to U.S. District Judge William D. Quarles, Jr. on January 13, 2011, in which he advocated for a concurrent sentence designation for his federal firearm conviction. In that letter, BAILEY acknowledged that he had been raised in a loving, middle-class family, and had even benefitted from private school education.   He wrote:

> I don't hail from a poverty-stricken family.   My entire immediate family on my mother's side are of the middle class. I was raised to be a productive citizen in the African American society. I was put through private education & I am a devout Christian.   I continue to have the support of a loving family, but it took me years to understand & comprehend that.   Because of my actions, treading the wrong path, I am in prison today.   The decisions I made are the things that got me here, no one else's.   Today I acknowledge that & I want to apologize to society, my family, my friends & most of all those that I have hurt during my path of destruction.   I repent.

*See* Exhibit 8.

Notwithstanding his expressions of remorse to Judge Quarles in 2011, almost as soon as BAILEY was released later that year, he began recruiting people to join MMP and engaging in the pattern of murder, extortion, drug tampering, witness tampering, and witness retaliation that landed him here today.  Based on BAILEY's history, the Court should harbor no illusion that a message of specific deterrence has any hope of reaching him.  Instead, the Court should focus on the other goals of sentencing—protecting the public and deterring similar crimes by others.  Only a sentence of life will protect the public from future violent crimes by this defendant.  Only a sentence of life will send the message that this level of brutal, senseless violence will be met with the most serious of sanctions.

## III.     CONCLUSION

The government respectfully submits that a sentence of life imprisonment is necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553, namely, (1) to reflect the seriousness of the offense, leadership of a violent gang and participation in numerous murders, shootings, and the distribution of deadly drugs; (2) to afford adequate deterrence for criminal activity that has a devastating impact on the community; and (3) to protect the public from a defendant with a very serious criminal history and high likelihood of recidivism.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:  _____/s/_____
      Christina A. Hoffman
      Lauren E. Perry
      Assistant United States Attorneys
      36 S. Charles St., Fourth Floor
      Baltimore, Maryland 21201

33

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 30, 2019, a copy of the foregoing Government's

Sentencing Memorandum was served electronically to the Clerk of the United States District Court

using CM/ECF, and sent via e-mail to:

Teresa Whalen and Paul Enzinna,
Counsel for the Defendant


_____/s/_____
Christina A. Hoffman