**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. CCB-16-0267** |
| | ) | |
| DANTE BAILEY, | ) | **UNDER SEAL** |
| | ) | |
| RANDY BANKS, | ) | |
| | ) | |
| CORLOYD ANDERSON, | ) | |
| | ) | |
| JAMAL LOCKLEY, | ) | |
| | ) | |
| SHAKEEN DAVIS, and | ) | |
| | ) | |
| SYDNI FRAZIER, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR NEW TRIAL (ECF 1502, 1505, & 1514)**

The United States of America, by and through counsel, respectfully submits this consolidated response to the defendants' motions for new trial (ECF 1502, 1505, and 1514).

**I.     INTRODUCTION**

On June 2, 2020, Sydni FRAZIER filed a motion to reopen the suppression hearing in this case and for a new trial. The motion is based on a March 11, 2020 criminal information charging a former member of the investigative team—then-Task Force Officer Ivo Louvado of the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)—with lying about his participation in a theft of drugs that occurred in 2009. ECF 1502. On June 3, 2020, Dante BAILEY, Randy BANKS, Jamal LOCKLEY, Corloyd ANDERSON, and Shakeen DAVIS filed a motion for a new trial

making similar allegations.  ECF 1505.[1]  In both motions, the trial defendants allege that the criminal information against Louvado constitutes newly discovered evidence that would have resulted in a different outcome as to certain warrants authored by Louvado in 2016 and 2017, which led to evidence introduced against the defendants at their trials in 2019 and 2020.  *Id.*  The defendants also assert violations of *Brady v. Maryland* and *Giglio v. United States*.  The defendants do not allege that Louvado ever testified against any of them in any capacity.  They also do not allege that Louvado engaged in any misconduct in this case.  Nor do they allege that anything in the probable cause statements in the Louvado-authored warrants was false or misleading in any respect (aside from his failure to disclose the 2009 theft).  Finally, they do not allege that the prosecution had any knowledge of Louvado's 2009 misconduct when the warrants at issue were obtained and executed.

The defendants' claims are meritless.  The newly discovered evidence of Louvado's 2009 misconduct does not entitle them to a new trial because it is mere impeachment evidence as to a non-witness; it would not have led to a successful challenge of the Louvado-authored warrants under *Franks v. Delaware*; and, in any event, the evidence derived from those warrants was cumulative and immaterial in light of the vast amount of evidence establishing the defendants' guilt.  The government also had no *Brady* or *Giglio* obligation to disclose potential impeachment information about a person who never testified against any of the defendants, where that information bore no factual relationship at all to the instant case. To the contrary, the government fully satisfied its obligations set forth in *Brady*, *Giglio*, and other applicable discovery rules.  At

---

[1]     The defendants filed a supplemental brief on June 17, 2020, alleging that the government had reason to doubt TFO Louvado's credibility based on pretrial litigation in two other cases.  ECF 1514 (citing *United States v. Tyrone Powell and Gregory Fitzgerald*, Case No. L-09-0373 (D. Md.), and *United States v. Gerrod Davis*, Case No. CCB-09-0400 (D. Md.)).

the same time, the government also met its obligation to the public to conduct a searching corruption investigation and bring to justice law enforcement officers who abused their position of trust by stealing money and drugs.  That prosecution provides no legal basis for disturbing the guilty verdicts returned by two separate juries after hearing from over 70 witnesses and reviewing close to 1,000 exhibits over the course of more than 7 weeks of trial.  Accordingly, the defendants' motions should be denied.

## II.     STATEMENT OF FACTS

### A.  The MMP Investigation

On September 22, 2016, a federal grand jury for the District of Maryland returned a Superseding Indictment charging twenty-four members and associates of a subset of the Bloods gang known as Murdaland Mafia Piru (MMP) with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to distribute one kilogram or more of heroin and 280 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count Two); and other drug and gun offenses.  ECF 46.  A Second Superseding Indictment returned on June 1, 2017 charged two additional defendants in the racketeering and drug trafficking conspiracies, and added a number of charges, including charges of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1).  ECF 515.

The indictment was the result of years of investigation by over one hundred federal, state, and local law enforcement officers from agencies including Homeland Security Investigations (HSI), the Baltimore County Police Department (BCPD), the Baltimore Police Department (BPD), the ATF, the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), the Maryland State Police (MSP), the Maryland Department of Public Safety and Correctional Services (DPSCS), the Maryland Transportation Authority (MTA), and even the National

Aeronautics and Space Administration (NASA).   The officers gathered evidence from a wide array of sources, including eight HSI-led wiretaps in June and July 2015 (seven of which resulted in intercepted conversations), four ATF-led wiretaps in July and August 2016 (three of which resulted in intercepted conversations), approximately 26 controlled purchases of narcotics and firearms; search warrants executed on approximately 22 residences and vehicles, 86 cell phones, and 27 social media accounts; cell site location information for over a dozen cell phones; hundreds of recorded jail calls; dozens of intercepted jail mailings; DNA and ballistic evidence; and scores of witnesses.   Over the course of the investigation, law enforcement officers seized 42 firearms, over a kilogram of heroin, over 280 grams of crack cocaine, and MMP gang paperwork from a variety of locations.

The investigation revealed that MMP was descended from the Tree Top Piru (TTP) set of the Bloods gang, and was modeled after the Italian Mafia.   In 2011, the gang's leader, Dante BAILEY, a/k/a "Gutta," a/k/a "Werewolf," traveled to California to meet with West Coast TTP leaders and gain their approval for the MMP Bloods set in Baltimore.   MMP was organized hierarchically, with a "Don" or "Godfather" at the top (Dante BAILEY) and various "Bosses," "Underbosses," "Capos," "Lieutenants," and "Mobsters" underneath.   According to MMP gang paperwork, certain ranking members had specialized functions, such as the "Five-Star General," whose job was "training soldiers to defend our family," and the "Boss of All Bosses," whose job was overseeing the gang's finances and "orchestrat[ing] a dues system."   Prospective members of MMP were required to successfully complete an initiation process and recite an oath of loyalty called the "Omerta Code."

MMP gang paperwork laid out certain rules of conduct that members were expected to follow.   Members who violated these rules or who disobeyed an order from a superior were

subjected to disciplinary measures, which ranged from fines or work assignments for minor violations, to physical beatings or stabbings for more serious violations, to murder for the most serious violations.  Violations that were punishable by death included "[a]ny acts or attempted acts of treason" and "[a]ny co-operation with authorities that lead[s] to incriminating others."  Other MMP rules included: "[w]hen at war fight like you are ready to die," and "[w]henever we are forced to strike, our only option is to kill."  MMP members enhanced their status within the gang by carrying out acts of violence against rivals; for instance, members could earn a "lightning bolt" tattoo for "killing for the Mob."  Several MMP members, including BAILEY, had lightning bolt tattoos on their faces or bodies.

MMP members and associates operated street-level drug shops in various locations in Baltimore City, where they sold heroin, cocaine, crack cocaine, fentanyl, and marijuana, among other controlled substances.  MMP's primary drug shops were at the BP gas station in the 5200 block of Windsor Mill Road (which MMP considered to be its headquarters), and at the intersection of Gwynn Oak Avenue and Liberty Heights Avenue.  The drug shop in the 5200 block of Windsor Mill Road was particularly lucrative because of its close proximity to Interstate 70, which made it easily accessible to drug customers driving from western Maryland and neighboring states.  It was not unusual for the defendants to sell over a kilogram of drugs per week at this location, which could translate to over $100,000 in drug revenue.  MMP members and associates frequently stashed drugs and firearms on the premises of the BP gas station and made drug sales at the gas pumps or within the store itself.

Between 2011 and the date of the Second Superseding Indictment, MMP dominated the drug trade in large swaths of Northwest Baltimore and neighboring Baltimore County and wreaked havoc in the surrounding communities.  The defendants were responsible for at least five murders;

six attempted murders (three of which resulted in life-threatening bodily injury); numerous additional conspiracies to commit murder, assaults, and robberies; and six years of high-volume street-level drug trafficking.  They used violence and threats of violence to eliminate would-be rivals and silence witnesses.  They profited from the scourge of addiction.  And they left behind a legacy of fear, misery, and contempt for the rule of law.

The vast, vast majority of the evidence in the case was generated by law enforcement officers other than Louvado—and in fact preceded ATF's involvement in the case in March 2016.  It is not feasible to provide a complete accounting of all the trial evidence generated as a result of these efforts, but we summarize some of the highlights in the sections below.

### 1.     The HSI/BCPD/BPD Investigation

In 2015, HSI partnered with the BCPD and BPD to lead an extensive wiretap investigation that led to the majority of the drug and gun evidence that was admitted at trial.

For example, on February 12, 2015, BCPD Detective Mark Fisher conducted a traffic stop of Dominick Wedlock, a/k/a "Rage," and William Jones, a/k/a "Bill,"[2] in the 1900 block of Forest Park Avenue that resulted in the recovery of marijuana, over $3,500 in cash, and several cell phones containing incriminating text messages and photographs of Wedlock with other members of the gang.  Later that day, BCPD officers executed a search warrant at Wedlock's residence in the 2000 block of Englewood Avenue and recovered a Smith & Wesson .357 caliber firearm, a loaded .45 caliber magazine, and counterfeit currency.

On April 23, 2015, BCPD Detective Scott Young conducted a traffic stop of Dante BAILEY near the intersection of Windsor Mill Road and Beverly Avenue that led to the recovery

---

[2]     Wedlock and Jones pled guilty prior to trial.

of approximately 21 grams of heroin.

On May 8, 2015, Detective Fisher arrested Jarmal Harrid[3] on an open warrant at a hotel room in Baltimore County, where he recovered approximately 27 grams of cocaine, 24 grams of heroin, 17 grams of marijuana, and over $8,100 in cash.

Based on this and other evidence, in June and July 2015, BCPD Detective Dimitri Goodwin and BPD Detective David Pietryak obtained authorization from the Circuit Court for Baltimore County to intercept wire and electronic communications over several cell phones belonging to Adrian Jamal Spence, a/k/a "Spittle" or "SP," who was known to be a heroin supplier for the gang.[4] As a result of the wiretaps, HSI and BCPD intercepted hundreds of communications in which Spence discussed drug trafficking, guns, and violence with other members of MMP, including BAILEY, Wedlock, Jones, Harrid, Jamal LOCKLEY, Dontray Johnson, Jamal Smith, Takuma Tate, and Tiffany Bailey.[5] For instance, in one call between Spence and Harrid, call G-232, Spence described in detail an attempted murder that BAILEY committed at the BP gas station in the 5200 block of Windsor Mill Avenue on July 21, 2015. There were also numerous calls in which Spence agreed to supply LOCKLEY with distribution quantities of heroin—for example, calls D-307 (10 grams), D-554 (25 grams), D-664 (40 grams), and G-148 (50 grams).

As a result of the wiretaps, HSI, BCPD, and BPD executed a number of traffic stops and search warrants that led to significant seizures of drugs and other evidence. For instance, on July 3, 2015, BCPD Officer Trae Corbin conducted a directed stop of a vehicle being driven by Tiffany Bailey. Officer Corbin recovered approximately 27 grams of heroin and 24 grams of cocaine from

---

[3]      Harrid pled guilty prior to trial.

[4]      Spence pled guilty prior to trial.

[5]      Johnson, Smith, Tate, and Tiffany Bailey pled guilty prior to trial.

the vehicle.  In a subsequent wire call (call B-2049), BAILEY told Spence that Tiffany had been stopped and that the police had seized his (*i.e.*, BAILEY's) drugs.

Based in part on the traffic stop and wire call, BCPD Detective Scott Griffin obtained a search warrant for Dante BAILEY's residence at 3901 Princely Way, Pikesville, Maryland, which was executed by Detective Fisher and other officers later that day.  From a Mercury Marauder parked outside the residence, Detective Fisher recovered a Smith & Wesson .357 caliber firearm and a Beretta 9mm caliber firearm.  From inside the residence, Detective Fisher recovered drug packaging material, a money counter, a gun holster, two cell phones, keys to the Mercury Marauder, and MMP gang paperwork.  The gang paperwork described MMP's history and structure and listed members of the gang who held certain ranks—for example, "Werewolf" (Dante BAILEY) as "Godfather"; "Murder" (Ayinde Deleon) as "Boss of all Bosses"; "Sand" (Randy BANKS) as "Boss of Finance"; Spittle" (Spence) as "Universal Boss"; "Jim" (Corloyd ANDERSON) as "Boss"; "Rage" (Wedlock) and "Gambino" (Johnson) as "Underbosses"; and "Menace" (Melvin Lashley), "Ghost" (Jacob Bowling), and "Trouble" (William Banks) as "Capos."[6]  *See* Gov. Trial Ex. GP4a, at 2–3.  Dante BAILEY was arrested, and the following day, he made a series of jail calls to Jay Greer, who had been inside the residence at the time of the search warrant.  In the calls, BAILEY criticized Greer for not taking the gun charge for BAILEY, and instructed Greer to continue running the drug trafficking operation in BAILEY's absence.  BAILEY also arranged for Greer to obtain 200 grams of heroin from Kenneth Torry, another drug supplier for the gang.[7]  *See* Gov. Tr. Exs. J-18, J-19, J-20, J-21, J-22.

Spence's wiretap calls made clear that he was using a residence at 532 Coventry Lane,

---

[6]      Deleon, Mevin Lashley, Bowling, and William Banks pled guilty prior to trial.

[7]      Greer and Torry pled guilty prior to trial.

Baltimore, Maryland to stash the heroin that he was supplying to the gang.  On July 3, 2015, BCPD officers executed a search warrant at the residence, where they recovered approximately 608 grams of heroin and various drug trafficking paraphernalia.

At the conclusion of the HSI-led wiretap investigation, Detectives Pietryak and Goodwin obtained search warrants for a number of residences and vehicles, including: (1) Spence's residence at 338 Marydell Road, Baltimore, Maryland; (2) Johnson's residence at 4 Wyegate Court, Owings Mills, Maryland; (3) Harrid's residence at 7 Hartley Circle, Owings Mills, Maryland, and his 2004 Honda Accord with Maryland tag 41399CF; (4) Jones' residence at 19 S. Tremont Street, Baltimore, Maryland; and (5) Torry's residence at 21 Samantha Court, Owings Mills, Maryland and his 2009 Honda Accord with Maryland tag 2BT8316.

From Spence's residence, Detective Pietryak recovered an Israel .40 caliber firearm, $26,250 in cash, and fourteen cell phones.  One of Spence's cell phones contained dozens of text messages in which Spence discussed drug transactions, including one in which he threatened to kill a customer for failing to pay a drug debt.  *See* Gov. Tr. Ex. CELL12a.  From Johnson's residence, BCPD Detective Joe Cohan recovered approximately 28 grams of heroin, 70 rounds of .22 caliber ammunition, a bullet-proof vest, $1,480 in cash, an MMP gang photograph, an "owe sheet," or tally of drug debts owed by various members and associates of the gang, and four cell phones.  From Harrid's residence, Detective Young recovered approximately 60 grams of heroin, 26 grams of marijuana, a digital scale, a gun holster, drug packaging material, over $7,700 in cash, and two cell phones.   From Jones' residence, NASA Agent Robert Pulliam recovered approximately 13 grams of cocaine, over $1,170 in cash, two cell phones, and more MMP gang paperwork.

Finally, from Torry's residence, Detective Fisher recovered approximately 29 grams of

marijuana, a digital scale, a Jiminez Arms 9mm caliber firearm, and two cell phones.  One of Torry's cell phones contained pages and pages of text messages in which he discussed drug trafficking with other members of the gang, including BAILEY, DAVIS, FRAZIER, and LOCKLEY.  For instance, in one text exchange, DAVIS agreed to help Torry distribute 100 grams of heroin.  *See* Gov. Tr. Ex. CELL14a, at 10.  In another, BAILEY promised to pay Torry for a supply of 100 grams of heroin once police presence in the area died down.  *See id.*

Following his July 3, 2015 arrest, BAILEY was incarcerated for a period of time at the Baltimore County Detention Center while he awaited trial on state charges.  While there, BAILEY attempted to recruit another inmate to join MMP.  BCDC Lieutenant Dawn Copper recovered MMP gang paperwork from the recruit's jail cell, written in BAILEY's distinctive handwriting. The paperwork laid out the history and structure of MMP and described tattoos that could be earned in furtherance of the gang, such as the "M" for "taking the Mafia oath" and the lightning bolt for "killing for the Mob."  Gov. Tr. Ex. GP11A.

### 2.     Other Stops and Seizures

Other key evidence in the case was generated not by any long-running investigation, but by ordinary police work by officers who responded to calls for service or conducted traffic stops that resulted in seizures of drugs and other evidence.

For example, on September 12, 2012, BPD Officer Timothy Lee responded to a call for service in the 1900 block of Forest Park Avenue, where he arrested DAVIS in possession of a stolen Smith & Wesson .45 caliber firearm.

On November 4, 2012, BPD Officer Jason DiPaola conducted a traffic stop of Devon Dent[8]

---

[8]     Dent pled guilty prior to trial.

that led to the recovery of distribution quantities of heroin, cocaine base, and marijuana, as well as MMP gang paperwork setting forth the history structure, structure, and rules of the gang. *See* Gov. Tr. Ex. GP2A.

On February 15, 2014, MTA Officer Joseph Schmidt seized approximately $88,000 in drug proceeds from Corloyd ANDERSON's courier at BWI International Airport.  ANDERSON showed up to claim the money, and told law enforcement officers that he had won the money gambling.

On June 18, 2015, BPD Sergeant Frank Friend responded to the scene of a disturbance in the 1900 block of Forest Park Avenue, where he recovered approximately 33 grams of marijuana from BAILEY's Lexus, as well as a Ruger 9mm handgun from the wheel well of an adjacent vehicle.

On January 26, 2016, BPD Detective Victor Villafane arrested Charles Blackwell[9] and three unindicted co-conspirators who were dealing drugs at the BP gas station in the 5200 block of Windsor Mill Road.  Detective Villafane recovered distribution quantities of heroin, cocaine, and marijuana; three loaded firearms; $2,587 in cash; as well as surveillance footage showing a member of the group attempting to stash his gun with the store clerk as police entered the building.

On April 26, 2016, BCPD Officer Philip Wilson conducted a traffic stop of DAVIS at the intersection of Security Boulevard and Gwynn Oak Avenue that resulted in the recovery of a stolen Glock .40 caliber handgun; a loaded AR-15 rifle; a small, digital scale; a bottle of Inisotol (commonly used as a cutting agent with heroin); a balaclava mask; and three cell phones.  One of DAVIS's cell phones contained pages and pages of text messages in which DAVIS discussed drug trafficking, guns, and violence.  This arrest was the basis for Count Sixteen of the Second

---

[9]       Blackwell pled guilty prior to trial.

Superseding Indictment, which charged DAVIS with possession of firearms and ammunition by a felon, in violation of 18 U.S.C. § 922(g).

On May 12, 2016, Officer DiPaola conducted covert surveillance outside a vacant dwelling at 5509 Gwynn Oak Avenue that was used by Randy BANKS to conduct drug trafficking activity. Officer DiPaola observed Randy BANKS directing several drug customers to a co-conspirator who appeared to supply them with drugs.

### 3. The ATF Investigation

ATF first opened an investigation into MMP on March 1, 2016.  The two lead case agents for the ATF investigation were Special Agents Christian Aanonsen and Timothy Moore.  Dozens of other ATF agents and Task Force Officers assisted with the MMP investigation over the next 18 months, including Louvado.  But the key evidence came from investigative action taken by Agents Aanonsen and Moore.

For example, on March 10, 2016, Agent Moore used two confidential informants, CS-1 and CS-2, to conduct a controlled purchase of approximately 14 grams of cocaine base from LOCKLEY near the intersection of Elsinore Avenue and Clifton Avenue.[10]  The controlled purchase was audio and video-recorded.  The recording showed LOCKLEY approach the driver's side window of the CS's vehicle and hand CS-2 a small plastic bag containing the drugs. LOCKLEY told CS-1 to let him know if CS-1 had any "complaints" about the product.  He also asked whether CS-1 knew how to "cook" cocaine into crack cocaine.  This controlled purchase was the basis of Count Ten of the Second Superseding Indictment, charging LOCKLEY with distribution of cocaine base.  It was also the basis of a later wiretap on LOCKLEY's cell phone,

---

[10]     Louvado was one of many officers who participated in this controlled purchase, but he was accompanied at all times by other officers.

which is discussed further below.

On May 12, 2016, Agent Moore obtained a search warrant for Dante BAILEY's residence at 7607 Reserve Circle, Windsor Mill, Maryland.  The probable cause for the warrant was based on BAILEY's unlawful possession of firearms and ammunition at Continental Arms Firing Range on May 3, 2016.  BAILEY had posted a video to his publicly available Instagram account showing him firing a handgun at the range.  Certified business records from Continental Arms confirmed that BAILEY had rented three handguns and purchased 150 rounds of ammunition.  The search warrant was executed on May 17, 2016.  From inside the residence, agents recovered a bag containing approximately 94 grams of heroin, three cell phones, a laptop, MMP gang paperwork containing the MMP oath and a list of disciplinary actions for "Level 1," "Level 2," and "Level 3" violations, and an autobiographical screenplay in which BAILEY described specific acts of violence very similar to ones that members of MMP were known to have carried out.[11]  BAILEY admitted the drugs were his in a video-recorded post-Miranda interview.  The May 3 gun range visit and the May 17 search warrant served as the basis for Counts Seventeen and Eighteen of the Second Superseding Indictment, charging BAILEY with possession of firearms and ammunition by a felon, and possession with intent to distribute heroin, respectively.

On August 16, 2016, Agent Moore obtained a search warrant for BAILEY's Apple iCloud account associated with the email address wolfmobb@icloud.com.  The returns from Apple included hundreds of incriminating emails, photos, and videos—for instance, an email with a tally of drug debts owed by members of the gang such as ANDERSON, Randy BANKS, and DAVIS, Gov. Tr. Ex. IC2; numerous photographs of BAILEY, ANDERSON, Randy BANKS, and DAVIS

---

[11]     Louvado was one of many officers who participated in the execution of this search warrant, but he was accompanied at all times by other officers.

making MMP gang signs, Gov. Tr. Exs. IC44–46, 55–59, 65, 75, 85, 107; a photograph of BAILEY and Randy BANKS in an MMP stash house standing near drug paraphernalia, Gov. Tr. Exs. IC52–53; a video of DAVIS doing an MMP gang handshake with other members of the gang, Gov. Tr. Ex. IC137; and MMP "slideshows" laying out the MMP gang hierarchy and depicting ANDERSON and Randy BANKS as "Bosses" of the gang, Gov. Tr. Ex. IC122–28.

On January 17, 2017, Agent Aanonsen obtained a search warrant for thirty-six cell phones and other electronic devices that had been seized over the course of the investigation.  These included the cell phones recovered from Wedlock, Harrid, Jones, and DAVIS by members of the BCPD, discussed above, as well as the cell phones and laptop recovered at BAILEY's residence on May 17, 2016.  The phones contained hundreds of pages of incriminating text messages discussing drug trafficking, guns, and violence, as well as gang-related videos.  For instance, BAILEY's Apple iPhone contained a video from the funeral of a slain MMP member, which showed Ayinde Deleon laying a maroon flag emblazoned with the letters "MMP" over the casket of the deceased.  *See* Tr. Ex. CELL1A, CELL1B3.

On January 20, 2017, Agent Aanonsen obtained a search warrant for twenty-three Instagram and Facebook accounts used by the defendants and their co-conspirators.  These included BAILEY's Instagram accounts with usernames "5almighty_gang2" and "dagreat_5200," BAILEY's Facebook account with username "DantetheGreat," DAVIS's Instagram account with username "creams_dinero," LOCKLEY's Instagram account with username "dirtyboydroyd," and FRAZIER's Instagram account with username "rip_bigsidnbarakaat."  The cell phones and social media accounts contained hundreds of pages of incriminating messages, photographs, and videos. For instance, DAVIS's Instagram account "creams_dinero" included a photograph of DAVIS holding a firearm with an extended magazine, and another of him making an MMP gang sign

accompanied by the caption "MURDERLAND MAFIA MOBB THE WORLD IS OURS." Gov. Tr. Ex. SM10. FRAZIER's Instagram account "rip_bigsidnbarakaat" included a photograph of him standing in front of MMP graffiti that read: "5200 M M PULL UP AT YOUR OWN RISK," as well as numerous references to drugs, guns, violence, and retaliating against "snitches." Gov. Tr. Ex. SM20.

On February 24, 2017, a U.S. Marshals Task Force including MSP Sergeant Nayim Sadik arrested DAVIS in the Foot Locker at Mondawmin Mall on the outstanding federal arrest warrant for racketeering conspiracy and related charges. In a search of DAVIS's person incident to arrest, Sergeant Sadik recovered approximately 25 grams of cocaine base, a loaded, stolen Sig Sauer .22 caliber firearm, $1,373 in cash, and four cell phones. The gun and drugs were the basis of Counts Thirty, Thirty-One, and Thirty-Two of the Second Superseding Indictment, charging DAVIS with possession of a firearm and ammunition by a felon, possession with intent to distribute cocaine base, and possession of a firearm in furtherance of a drug trafficking crime.

The defendants' criminal activity did not stop when they were behind bars, and one of the key sources of evidence in the ATF investigation was recorded jail calls and jail writings. For instance, on September 29, 2017, correctional officers at NNRJ intercepted a handwritten "kite" from BAILEY in which he instructed a fellow detainee to mail a hit letter directing a co-conspirator named Kevin Forrest, a/k/a "Hollywood," to have cooperating witness J.G. murdered. The hit letter provided the cooperating witness's last known address. Gov. Tr. Ex. GP16A. Agent Aanonsen quickly obtained a search warrant for Forrest's residence at 2903 W. Lanvale Street, Baltimore, Maryland, which was executed on October 2, 2017. Inside the residence, agents recovered an Aero Precision AR-style pistol with two extended capacity magazines, a Glock .40 caliber handgun, a Springfield Armory 9mm caliber handgun, boxes of ammunition, a bulletproof

vest, multiple cell phones and electronic devices, and the hit letter that had been mailed on BAILEY's behalf.[12]  One of the firearms had been purchased after the hit letter was mailed.

Agents Moore and Aanonsen also reviewed hundreds of jail calls made by defendants and their co-conspirators between 2014 and 2017, forty-five of which were later introduced at trial. These included numerous calls implicating the defendants in drug trafficking, unlawful possession of firearms, and violence in furtherance of the gang.  For instance, there was a call in which FRAZIER and DAVIS discussed pooling money together to obtain a new supply of drugs, a call in which BAILEY instructed an unindicted co-conspirator to assault a particular inmate because he had cooperated against another member of the gang, a call in which DAVIS talked about collecting bail money for FRAZIER from other members of the gang, a call in which DAVIS told FRAZIER he had hidden guns in the woods near the BP gas station, a call in which Melvin Lashley and William Jones talked about DAVIS's AR-15, a call in which FRAZIER instructed DAVIS to collect a debt from a drug customer, and a call in which BAILEY instructed LOCKLEY to have cooperating witness W.B. murdered because he "told" on another member of the gang.  *See* Gov. Tr. Exs. J-3, J-4, J-6, J-24, J-65, J-69, J-70.

### 4.    Louvado's Involvement

All of the evidence discussed so far was derived from sources other than Louvado.  As noted above, Louvado was a member of the same ATF task force as Agents Moore and Aanonsen, and as such, he did participate in various aspects of the MMP investigation.  However, with two exceptions discussed below, the government is not aware of any instance in which Louvado made an observation, took a statement, or recovered evidence of interest to the case outside the presence

---

[12]    Louvado was one of many officers who participated in the execution of this search warrant, but he was accompanied at all times by other officers.

of other officers.  In all other instances, Louvado was accompanied by other agents and officers who could independently verify what occurred.  The two exceptions are as follows:

*First*, on July 28, 2016, Louvado participated in a controlled purchase of narcotics from Jacob Bowling using a registered confidential informant.  In advance of the transaction, the confidential informant called Bowling to arrange to purchase one and a half ounces of crack cocaine for $2,200; these calls were captured via an active wire on Bowling's phone and produced in discovery as calls TT2-4535 and TT2-4773.  Prior to the controlled purchase, Louvado checked the confidential informant to ensure he/she did not have contraband on his/her person.  The report does not indicate that anyone else was present when Louvado did this.  The controlled purchase was audio and video-recorded, and the recording showed Bowling hand the confidential informant a clear plastic bag containing narcotics.  Special Agents Moore and Troy Dannenfelser recovered the bag of narcotics from the confidential informant after the controlled purchase was completed.  Bowling pled guilty prior to trial in the case, and he admitted to distributing crack cocaine to the confidential informant on this occasion (as well as several other occasions).  *See* ECF 865, at 12.  Evidence of this controlled purchase was not introduced at trial, nor was information about it included in any search warrant.

*Second*, on August 4, 2016, Louvado conducted surveillance outside LOCKLEY's residence at 1868 Oxford Square, Bel Air, Maryland.  Louvado reported that he observed LOCKLEY exit the residence and drive away in a 2008 Lexus LS 460.  The report does not indicate that anyone else was present when Louvado did this.  However, Louvado captured his observations on video, and the video was turned over in discovery.  The video clearly showed LOCKLEY exiting the residence and getting into the Lexus, exactly as Louvado reported.

\*\*\*

Louvado was also the affiant for certain wiretaps and search warrants of relevance to the trial defendants between June 2016 and March 2017.  These wiretaps and warrants, and the probable cause supporting them, are described below:

*First*, on June 30, 2016, U.S. District Court Judge Ellen L. Hollander granted Louvado's application for an order authorizing interception of wire communications over telephone lines TT1 (used by Dwight Jenkins) and TT2 (used by Jacob Bowling).  *See* ECF 1505-4 (hereinafter, "TT1/TT2 Wiretap Application").

The probable cause for the TT1/TT2 wiretap was based on controlled purchases from Dwight Jenkins on May 10, 2016, May 16, 2016, and May 26, 2016, a controlled purchase from Jacob Bowling on June 2, 2016, and text messages exchanged between a confidential informant and Bowling on June 10, 2016.  Louvado authored the report about the May 10 controlled purchase from Jenkins, but he was not a key participant in it, and he was accompanied at all times by other officers.  Louvado did not even *participate* in the four other controlled purchases that served as the basis for probable cause.  All of the controlled purchases were audio and video-recorded, and the text exchange was photographed.  As part of his guilty plea, Bowling admitted to the facts of the June 2 controlled purchase.  *See* ECF 865, at 12.  Jenkins also pled guilty prior to trial and admitted to the facts of the May 10, May 16, and May 26 controlled purchases.  *See* ECF 370, at 5.  None of the factual material in the probable cause statement depended on personal observations by Louvado that could not be independently verified by other agents, as well as by video or photographic evidence.

On July 21, 2016, Judge Hollander granted Agent Moore's application for an order authorizing interception of wire communications over telephone line TT3, used by LOCKLEY.  *See* ECF 1505-5 (TT3 Wiretap Application).  Agent Moore's wiretap application incorporated

Louvado's previous application by reference, *id.* at 39, and briefly discussed two calls intercepted over line TT1 with Jenkins, *id.* at 41–43. However, the probable cause for TT3 was based on the March 10, 2016 controlled purchase of 14 grams of crack cocaine from LOCKLEY, described above. *Id.* at 39–40. Agent Moore's affidavit explained that on March 9, 2016, CS-2 made a controlled call to LOCKLEY on TT3 to arrange for CS-1 to purchase half an ounce of crack cocaine for $600. LOCKLEY agreed to the deal and instructed both CS's to come by the following day. *Id.* The conversation was recorded and verified by investigators by means of a consensual wiretap on CS-2's cell phone. *Id.* The controlled purchase took place the following day. *Id.* As described above, the video recording showed LOCKLEY handing the drugs to the confidential informants and engaging in drug-related conversation with them. *Id.* This controlled purchase was sufficient, by itself, to support the issuance of the wiretap on TT3. Neither Louvado's prior TT1/TT2 application, nor the calls derived from it, were material to the probable cause determination for TT3.

**Second**, on September 26, 2016, United States Magistrate Judge A. David Copperthite granted Louvado's application for a warrant to search a number of residences and vehicles, including LOCKLEY's residence at 1868 Oxford Square, Bel Air, Maryland; ANDERSON's residence at 38 Windbluff Court, Owings Mills, Maryland; ANDERSON's business at 5000 Wabash Avenue, Unit A ("We Cater To You Motors LLC"), Baltimore, Maryland; and DAVIS's residence at 4130 Edmondson Avenue, Baltimore, Maryland. *See* ECF 1505-7 (hereinafter, "Takedown Warrant"). The government did not introduce any evidence from ANDERSON's business or from DAVIS's residence at trial, so we focus on the LOCKLEY and ANDERSON residences below.[13]

---

[13]      Counsel for ANDERSON did, however, introduce evidence from ANDERSON's business

- <u>Jamal Lockley's Residence at 1868 Oxford Square</u>:  The probable cause for the warrant was based on the March 10, 2016 controlled purchase of crack cocaine from LOCKLEY, described above.  Louvado participated in this controlled purchase, but he was accompanied at all times by TFO Christopher Faller, who testified at trial.  CS-2 (who was W.B.) also testified about this controlled purchase at trial.  The controlled purchase was audio and video-recorded, and the recording was introduced at trial.  The facts about the controlled purchase could be, and were, independently verified by other witnesses.  The information tying LOCKLEY to the residence at 1868 Oxford Square included the following: (a) public records showing that LOCKLEY's girlfriend, Cheyenne Simmons, listed 1868 Oxford Square as her residence; (b) utility records showing that service to the residence was in Simmons' name, (c) prior domestic violence complaints regarding Lockley and Simmons at the residence; (d) recent traffic citations issued to LOCKLEY at the residence by the Maryland State Police; (e) surveillance conducted by TFO Bradley Hood, during which he observed the 2008 Lexus that LOCKLEY was known to drive parked in front of the residence, and (f) the surveillance conducted by Louvado on August 4, 2016, during which he saw LOCKLEY exit the residence and depart in the 2008 Lexus.  As described above, Louvado's observations during the course of that surveillance were captured on video.

- <u>Corloyd Anderson's Residence at 38 Windbluff Court</u>:  The probable cause for the warrant was based primarily on wiretap calls intercepted over line TT3 between LOCKLEY and ANDERSON in which they used coded language to discuss drug

---

search during the defense case.

dealing.  Agent Aanonsen testified about these calls at trial.  The affidavit also included information provided by a confidential source, CS-4, during a proffer in which multiple agents and prosecutors participated.  CS-4 (who was D.H.) later testified at trial.  The information tying Anderson to the residence included MVA records showing that ANDERSON's wife, Latoya Anderson, lived there, as well as surveillance of ANDERSON at the residence conducted by Agent Moore.  None of the factual material in the probable cause statement depended on Louvado's personal observations.

*Third*, on February 10, 2017, U.S. Magistrate Judge J. Mark Coulson granted Louvado's application for a warrant for FRAZIER's cell phones seized at the time of his arrest on January 25, 2017.  *See* ECF 1505-8 (hereinafter, "Frazier 1/25/17 Cell Phone Warrant").  The probable cause for the warrant was based in part on ballistic and DNA evidence tying FRAZIER to the August 10, 2016 murder of Ricardo Johnson.  Louvado did not participate in this homicide investigation. The probable cause was also based on the circumstances of FRAZIER's arrest by Agent Moore on January 25, 2017.  Agent Moore recovered roughly five grams of heroin and fentanyl from FRAZIER's person along with the three cell phones in question.  Agent Moore testified about the items recovered at trial.  Louvado did not participate in this arrest.  None of the factual material in the probable cause statement depended on Louvado's personal observations.

*Fourth*, on February 22, 2017, Judge Copperthite granted Louvado's application for a warrant to search Sydni Frazier's Instagram account with username "getmneyboy."  *See* ECF 1505-9 (hereinafter, "Frazier Getmneyboy IG Warrant").  The probable cause for the warrant was based in part on the same information tying FRAZIER to the August 10, 2016 murder of Ricardo Johnson.  Again, Louvado was not involved in this homicide investigation.  The probable cause

for the warrant was also based on FRAZIER's publicly available Instagram posts and a recorded jail call by FRAZIER. Agent Aanonsen testified about the Instagram posts at trial, and Agent Moore testified about the jail call. None of the factual material in the probable cause statement depended on Louvado's personal observations.

*Fifth*, on March 21, 2017, Judge Coulson granted Louvado's application for a warrant to search DAVIS's cell phones seized at the time of his arrest by the U.S. Marshals Task Force on February 24, 2017. *See* ECF 1505-10 (hereinafter, "Davis 2/24/17 Cell Phone Warrant"). The probable cause for the warrant was based on the circumstances of DAVIS's arrest. As discussed above, Sgt. Sadik searched DAVIS's person and recovered a loaded handgun, a distribution quantity of cocaine base, and a large amount of cash, along with the four cell phones in question. Sgt. Sadik testified about the items recovered at trial. Louvado was not involved in this arrest. None of the factual material in the probable cause statement depended on Louvado's personal observations.

*Sixth*, on March 21, 2017, Judge Coulson granted Louvado's application for a warrant to search DAVIS's Instagram account with username "fh_dinero." *See* Exhibit 1 ("hereinafter "Davis fh_dinero IG Warrant"). The probable cause for the warrant was based on DAVIS's arrest on February 24, 2017, as described above, as well as some of DAVIS's publicly available Instagram posts. Agent Aanonsen testified about these Instagram posts at trial. Again, none of the factual material in the probable cause statement depended on Louvado's personal observations.

In summary, the probable cause statements supporting the Louvado-authored wiretap and warrants did not depend on any personal observations by Louvado that were not independently verified by other witnesses and evidence. In fact, the vast majority of the factual material in the affidavits was simply relayed to Louvado by other witnesses who later testified at trial.

22

### B.  The MMP Motions Hearings

The defendants filed a total of roughly eighty-three pretrial motions challenging various aspects of the indictment and moving to suppress evidence and statements.  Relevant here:

- ANDERSON and LOCKLEY moved to suppress evidence derived from the TT1 and TT2 wiretaps supported by Louvado's application, as well as the TT3 and TT4 wiretaps supported by Agent Moore's application.  ECF 399, 492.  None of the other trial defendants challenged the ATF wiretaps because they had not been intercepted.[14]

- LOCKLEY moved to suppress evidence derived from the Louvado-authored warrant for his residence at 1868 Oxford Square.  ECF 493.

- ANDERSON moved to suppress evidence derived from the Louvado-authored warrant for his residence at 38 Windbluff Court.  ECF 398.

- FRAZIER moved to suppress evidence derived from the Louvado-authored warrants for his three cell phones seized at the time of his arrest on January 25, 2017, ECF 591, and for his Instagram account "getmneyboy," ECF 594.

- DAVIS filed eleven pretrial motions but did *not* move to suppress evidence derived from either the Louvado-authored warrant for his cell phones seized at the time of his arrest on February 24, 2017, or the Louvado-authored warrant for his Instagram account "fh_dinero."  *See* ECF 385–91, 689–90, 694, 746.

- Neither BAILEY nor Randy BANKS challenged any of the wiretaps or warrants at

---

[14]     BAILEY was intercepted in two calls with LOCKLEY on Line TT3, but they were both recorded jail calls from Northern Neck Regional Jail.  *See* Gov. Tr. Exs. J-65, TT3-4106.  As such, there was an independent source for the evidence.  DAVIS was subsequently identified in two wiretap calls on Line TT3 based on the testimony of a cooperating witness, M.L., who recognized DAVIS's voice.  *See* Gov. Tr. Exs. TT3-3533, 3626.  Neither defendant was intercepted in any calls on Lines TT1 or TT2.

issue because they were not relevant to their respective cases.

The ANDERSON, LOCKLEY, and FRAZIER motions challenging the Louvado-authored warrants consisted largely of legal boilerplate.  Although the defendants challenged the quantum of probable cause supporting the warrants, none of them alleged that any of the factual material in the statements of probable cause was false or misleading in any respect.  None of the defendants requested a hearing pursuant to *Franks v. Delaware* to test the veracity of Louvado's sworn statements.[15]

The District Court divided the defendants' motions into two groups: those that required the taking of testimony and evidence, and those that did not.  A hearing on the first set of motions was held on June 1, 2018.  *See* Exhibit 2 (Tr. of Hearing, June 1, 2018).  These included motions to suppress certain of the defendants' statements as well as evidence derived from certain warrantless searches.  Louvado testified at this hearing, but his testimony pertained exclusively to a custodial statement made by co-defendant Devon Dent during a transport ride in October 2016.  *See id.* at 182–209.[16]  Dent pled guilty after the hearing, prior to resolution of the motion.  ECF 1017.  The statement about which Louvado testified was not used in the factual stipulation supporting Dent's guilty plea, *see* ECF 1018, nor was it used against any of the trial defendants.

---

[15]    ANDERSON *did* request a Franks hearing with respect to Agent Moore's wiretap application for TT4, ANDERSON's phone.  ECF 786, at 2.  The District Court ruled that the motion challenging TT4 was moot because no calls were intercepted over TT4.  ECF 875, at 1.  Although GPS information obtained as a result of the TT4 wiretap was used in the search warrant for ANDERSON's residence at 38 Windbluff Court, the Court ruled that the GPS information was not necessary to the probable cause determination.  ECF 875, at 2 ("The GPS data from TT4 was excluded from consideration in determining that probable cause was shown."); *see also* Ex. 3, at 57–63.

[16]    The statement was made in the presence of two other ATF task force officers.  The government is not aware of any information suggesting that Louvado's testimony about Dent's statement was untruthful in any respect.

On August 24, 2018, the District Court held a hearing on the second set of motions, which included the motions to suppress evidence derived from the Louvado-authored warrants. *See* Exhibit 3 (Tr. of Hearing, Aug. 24, 2018). Counsel for LOCKLEY and FRAZIER submitted on the papers and did not offer additional argument at the hearing. *See id.* at 64; ECF 875, at 1. Counsel for ANDERSON presented argument on the motion to suppress evidence from ANDERSON's residence at 38 Windbluff Avenue. She made clear that "our argument really is the question of whether or not there was probable cause based within the four corners of the affidavit." Ex. 3, at 51. Again, no defendant challenged the veracity of the information in the Louvado-authored warrants. There was not a single mention of Louvado's name at the hearing. *See generally id.*

The District Court denied the defendants' motions in a written ruling issued on August 31, 2018. ECF 875. With respect to the wiretaps, the Court ruled: "None of the defendants offered specific examples as to the supposed deficiencies in the wiretaps. Based on the court's review, the wiretap affidavits provided ample probable cause, necessity was demonstrated, and proper minimization procedures were followed." *Id.* at 1. With respect to the other warrants, the Court ruled that the affidavits contained sufficient probable cause, or that the government was entitled to rely on the good faith exception in *United States v. Leon*, 468 U.S. 897 (1984). *See id.* at 2–4.

### C. The MMP Trial

On March 18, 2019, the government proceeded to trial against six defendants: Dante BAILEY, Randy BANKS, Jamal LOCKLEY, Corloyd ANDERSON, Shakeen DAVIS, and Sydni FRAZIER. ECF 1097. The government called sixty witnesses and introduced 748 exhibits over the course of roughly six weeks.[17] *See* Exhibit 4 (Gov't Trial Ex. List, Bailey et al., ECF 1162).

---

[17]      Specifically, the government called the following 50 law enforcement witnesses: Christian

As discussed above, Louvado did not appear as a witness at trial. In addition to the law enforcement witnesses discussed in Section II.A, the government's trial witnesses included members and associates of MMP, rivals and victims of the gang, drug customers of the defendants', and homicide detectives who responded to the scenes of murders and shootings.

It would be impossible to provide a full accounting of the testimony and evidence introduced over the course of the six-week trial. But the vast majority of it stemmed from the efforts of law enforcement officers other than Louvado—much of which has been summarized above. In addition, a central focus of the trial was on the investigation into the violence committed by the defendants and their co-conspirators over MMP's bloody six-year reign—as to which

---

Aanonsen, Special Agent (Case Agent) (ATF), Tim Moore, Special Agent (Case Agent) (ATF), David Collier, Special Agent (ATF), Dave Cheplak, Special Agent (ATF), Troy Dannenfelser, Special Agent (ATF), Lindsay Erbe, Special Agent (ATF), Don Rudy, Special Agent (ATF), Kevin Carvell, Task Force Officer (FBI) (DPSCS), Michael Pratt, Task Force Officer (ATF) (BPD), Mathew Wilde, Special Agent (FBI), Christopher Faller, Task Force Officer (DEA) (BPD), David Pietryak, Task Force Officer (DEA) (BPD), Robert Pulliam, Special Agent (NASA), Luis Delgado, Homicide Detective (BPD), Juan Diaz, Homicide Detective (BPD), Jason DiPaola, Police Officer (BPD), Frank Friend, Sergeant (BPD), David Jones, Police Officer (BPD), Christopher Kazmarek, Homicide Detective (BPD), Richard Moore, Homicide Detective (BPD), Gary Niedermeier, Homicide Detective (BPD), Victor Villafane, Detective (BPD), Daniel Lamont, Firearms Examination Unit (BPD), James Wagster, Firearms Examination Unit (BPD), Virginia Cates Sladko, DNA/Serology Laboratory (BPD), Lindsay Armstrong, Drug Laboratory (BPD), Mohammed Majid, Drug Laboratory (BPD), Meghan Melnyk, Drug Laboratory (BPD), Emmanuel Obot, Drug Laboratory (BPD), Monique Pitts, Drug Laboratory (BPD), Barry Verger, Drug Laboratory (BPD), Leon White, Drug Laboratory (BPD), Joe Cohan, Detective (BCPD), Trae Corbin, Police Officer (BCPD), Mark Fisher, Homicide Detective (BCPD), Timothy Lee, Police Officer (BCPD), Philip Wilson, Detective (BCPD), Scott Young, Homicide Detective (BCPD), Roger Covington, Drug Laboratory (BCPD), Howard Rosenkoff, Drug Laboratory (BCPD), Nayim Sadik, Sergeant (Maryland State Police), Anthony Carrai, Police Officer First Class (Bowie Police Department), Joseph Schmidt, Officer (Maryland Transportation Authority), Dawn Copper, Lieutenant (Baltimore County Detention Center), J. English, Captain (Northern Neck Regional Jail), J. Laron Locke, Medical Examiner (Maryland Office of the Chief Medical Examiner, or OCME), Pamela Southall, Medical Examiner (OCME), Jack Titus, Medical Examiner (OCME), Donna Vincenti, Medical Examiner (OCME). The government also called the following 10 civilian witnesses, whom we denote by their initials for safety reasons: F.A., W.B., J.D., D.F., J.G., D.H., M.L., C.L., B.R., and S.R.

Louvado had zero involvement.  For instance, the government proved up the following acts of violence committed by the defendants in furtherance of MMP:

Murder of James Edwards (Count Three, VICAR Murder): On February 12, 2015, BAILEY murdered MMP member James Edwards, a/k/a "Bangout," in the 300 block of Collins Avenue.  Three witnesses—W.B., J.G., and D.H.—testified that BAILEY killed Bangout because he was showing disloyalty to MMP.  A fourth witness, M.L. testified that he learned from Jamal Smith that Smith had brought Bangout to meet with BAILEY on the night of the murder.  The .40 caliber casings from the scene of the murder were matched to .40 caliber casings from the scene of a shooting three nights earlier at the BP gas station in the 5200 block of Windsor Mill Road. The government introduced security camera footage from the BP gas station establishing that BAILEY committed that shooting.  W.B. also testified that he was present and witnessed BAILEY shooting at unknown rivals.  BPD Homicide Detective Christopher Kazmarek introduced cell phone records showing that BAILEY called Bangout dozens of times in the hours leading up to the murder, and the calls ceased after the murder occurred.

Attempted Murder of D.G. and D.J.: On May 30, 2015, DAVIS attempted to murder D.G. and D.J., firing at least nine rounds at them with a 5.56x45mm caliber assault rifle as they sat in their car in the 2100 block of North Forest Park Avenue.  M.L. testified that he was across the street and witnessed DAVIS hanging out the passenger window of his car firing a machine gun at the victims.  M.L. explained that DAVIS was retaliating against the victims because they had pulled a gun on a fellow MMP member, Brian Johnson a/k/a "Nutty B," earlier that day.  W.B. also testified about the shooting at trial.  W.B. had a conversation with DAVIS and another co-conspirator shortly after the incident.  With DAVIS present, the co-conspirator explained to W.B. that DAVIS had just shot some guys who had tried to rob "Nutty B."  W.B. also testified that

27

DAVIS changed the color of his car—an Infiniti—shortly after the shooting.  Consistent with W.B.'s testimony, the government introduced a jail call from June 2, 2015, in which FRAZIER asked DAVIS about the "G35" "coupe" he was driving.  (A G35 is a model of coupe made by Infiniti.)  DAVIS replied that he had to repaint his car because, "I did some dumb shit out of there, you feel me."  *See* Gov. Ex. J-17, J-17T.  Finally, the government introduced jail calls and evidence from DAVIS's April 26, 2016 arrest indicating that he was commonly in possession of assault rifles.  *See, e.g.*, Gov. Ex. J-71, J-71T.

Murder of Brian Johnson:  On September 29, 2015, Dontray Johnson murdered fellow MMP member Brian Johnson, a/k/a "Nutty B," because he refused to pay gang dues Johnson was collecting for BAILEY.  The government introduced security camera footage from the BP gas station in the 5200 block of Windsor Mill Road that showed Dontray Johnson shoot the victim in the chest at close range, sending him flying backward through the glass storefront.  W.B. and J.G. testified that prior to the murder, BAILEY instructed W.B. and Dontray Johnson to kill anyone who refused to contribute money to BAILEY while he was incarcerated.  Immediately after the murder, Johnson visited BAILEY at the Baltimore County Detention Center and recounted what happened.  The government introduced a recording of that visit.  In it, BAILEY approved the murder, saying, "I told you about this . . . Blow a fucking head off! Blow another nig**'s head off! I said I'm through. . . . Don't play with 'em.  Make 'em scared!"  W.B. testified that Dontray Johnson told him about the murder after the fact.  J.G. and M.L. also testified that they heard from other members of MMP that Dontray Johnson had killed Nutty B.

***

Quantitatively, of the government's 748 trial exhibits, 726 exhibits (97.1%) stemmed from warrants authored by, or evidence recovered by, agents other than Louvado.  In reality, the portion

of non-Louvado-derived evidence was much higher, as each disc of calls was counted as a single

exhibit.  For instance, the government introduced 51 wire calls from wiretap Lines B, D, and G,

which were supported by the affidavits of Detectives Goodwin and Pietryak.  *See* Gov. Tr. Ex.

WIREB, WIRED, WIREG.[18]  The government also introduced 49 wire calls from wiretap line

TT3, which was supported by the affidavit of ATF Agent Moore.[19]  *See* Gov. Tr. Ex. WIRE3.  And

the government introduced 45 jail calls through Agent Moore.[20]  *See* Gov. Tr. Ex. JAIL1.

Only 22 exhibits stemmed from warrants sworn out by TFO Louvado.  The following chart

provides the exhibit number, description, and source for each of those 22 exhibits:

| # | Gov. Tr. Ex. No. | Description | Source |
|---|---|---|---|
| 1 | WIRE1 | Disc of TT1 wire calls, from which only 5 calls were played[21] | TT1/TT2 Wiretap Application, ECF 1505-4 |
| 2 | WIRE2 | Disc of TT2 wire calls, from which only 6 calls were played[22] | TT1/TT2 Wiretap Application, ECF 1505-4 |
| 3 | SW6 | Photos of search warrant at Corloyd Anderson's residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 4 | F25 | Handgun recovered from Corloyd Anderson's residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |

[18]    These were calls B-74, B-641, B-863, B-877, B-912, B-1867, B-2406, B-2429, B-2478, B-2535, B-3427, B-4104, D-20, D-140, D-146, D-153, D-179, D-270, D-305, D-307, D-367, D-466, D-469, D-483, D-484, D-485, D-488, D-554, D-614, D-645, D-660, D-663, D-664, D-674, D-679, D-680, D-726, D-728, D-729, D-737, D-757, D-782, G-8, G-24, G-37, G-74, G-78, G-134, G-148, G-232, and G-396.

[19]    These were calls TT3-2922, 3064, 3225, 3354, 3533, 3586, 3626, 4083, 4106, 4222, 4398, 4418, 4429, 4441, 4521, 4526, 4560, 4604, 4846, 4863, 4903, 4904, 4910, 4928, 5072, 5078, 5225, 5293, 5298, 5365, 6022, 6120, 6158, 6171, 6172, 6173, 6175, 6178, 6217, 6777, 7327, 7331, 7363, 7376, 7382, 7392, 7455, 7934, and 8196.

[20]    These were calls J-2, J-3, J-4, J-5, J-6, J-7, J-9, J-11, J-14, J-15, J-16, J-17, J-18, J-19, J-20, J-21, J-22, J-23, J-24, J-25, J-28, J-29, J-30, J-31, J-32, J-34, J-36, J-39, J-44, J-46, J-48, J-49, J-50, J-53, J-54, J-55, J-56, J-58, J-59, J-60, J-65, J-66, J-67, J-69, J-70, and J-71.

[21]    These were calls TT1-51, 212, 1202, 1203, and 1218.

[22]    These were calls TT2-558, 682, 1749, 2365, 3003, and 3401.

| 5 | SW9 | Photos of search warrant at Jamal Lockley's residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |
|---|---|---|---|
| 6 | CELL11 | Jamal Lockley cell phone seized from residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 7 | CELL11a | Excerpts from Jamal Lockley cell phone seized 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 8 | CELL7a | Excerpts from Sydni Frazier cell phone seized 1/25/17 | Frazier Cell Phone Warrant, ECF 1505-8 |
| 9 | CELL8a | Excerpts from Sydni Frazier cell phone seized 1/25/17 | Frazier 1/25/17 Cell Phone Warrant, ECF 1505-8 |
| 10 | SM15 | Sydni Frazier getmneyboy Instagram account excerpts | Frazier getmneyboy IG Warrant, ECF 1505-9 |
| 11 | CELL3a | Excerpts from Shakeen Davis cell phone seized 2/24/17 | Davis 2/23/17 Cell Phone Warrant, ECF 1505-10 |
| 12 | SM13 | Shakeen Davis fh_dinero Instagram account excerpts | Davis fh_dinero IG Warrant, Ex. 1 |
| 13 | SW7 | Photos of search warrant at Ayinde Deleon's residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 14 | CELL4 | Ayinde Deleon cell phone seized 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 15 | CELL4a | Excerpts from Ayinde Deleon cell phone seized 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 16 | D22 | Marijuana from search warrant at Ayinde Deleon's residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 17 | SW13 | Photos of search warrant at Dwight Jenkins' residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 18 | CELL9 | Dwight Jenkins cell phone seized 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 19 | CELL9a | Excerpts from Dwight Jenkins cell phone seized 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 20 | SW8 | Photos of search warrant at Melvin Lashley's residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 21 | F20 | Handgun from search warrant at Melvin Lashley's residence on 9/27/16 | Takedown Warrant, ECF 1505-7 |
| 22 | F20a | Photo of gun from search warrant at Melvin Lashley's residence | Takedown Warrant, ECF 1505-7 |

Of these 22 exhibits, only the first 12 (1.6%) were derived from search warrants that the trial defendants would have standing to challenge. The rest were recovered from the residences of co-defendants who pled guilty prior to trial.

As shown in the chart, the government introduced only 11 wire calls from Lines TT1 and TT2 (supported by Louvado's affidavit), compared to a total of 100 wire calls from Lines B, D, and G (supported by the affidavit of Detectives Goodwin and Pietryak) and from Line TT3 (supported by Agent Moore's affidavit).  Moreover, of the 11 wire calls introduced from TT1 and TT2, only 5 calls involved one of the trial defendants—LOCKLEY.  Meanwhile, the government introduced 62 wire calls involving LOCKLEY from Lines B, D, G, and TT3.

As discussed further below, qualitatively, the Louvado-derived evidence consisted entirely of drug and gun evidence that was cumulative of evidence from other sources—for instance, the other search warrants, arrests, seizures, wire calls, jail calls, social media evidence, and cooperator testimony described in Section II.A and above.

\*\*\*

In the fifth week of trial, FRAZIER's court-appointed attorney, Christopher Davis, had a medical emergency that made it impossible for him to continue in the case.  The Court declared a mistrial as to FRAZIER due to manifest necessity and severed the Defendant from the case.  *See* ECF 1130.

On April 30, 2019, the jury returned verdicts of guilty against the five remaining defendants.  BAILEY, Randy BANKS, ANDERSON, LOCKLEY, and DAVIS were all convicted of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count Two).  BAILEY, ANDERSON, LOCKLEY, and DAVIS were convicted of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One).  In addition, BAILEY, ANDERSON, LOCKLEY, and DAVIS were convicted of the following counts specific to them individually:

| BAILEY | VICAR murder, 18 U.S.C. § 1959(a)(1) (Count Three) | February 12, 2015 murder of James Edwards (testimony of BPD Homicide Detective Christopher Kazmarek, BPD Firearms Examiners Daniel Lamont and James Wagster, |

| | | FBI Special Agent Mathew Wilde, W.B., J.G., D.H., M.L., and F.A.) |
|---|---|---|
| | Possession of firearms and ammunition by a felon, 18 U.S.C. § 922(g) (Count Seventeen) | May 3, 2016 visit to Continental Arms Firing Range (testimony of ATF Special Agents Moore and David Collier) |
| | Possession with intent to distribute heroin, 21 U.S.C. § 841 (Count Eighteen) | May 17, 2016 search warrant at 7607 Reserve Circle (testimony of Agent Moore and BPD Chemist Emmanuel Obot) |
| ANDERSON | Possession of a firearm and ammunition by a felon, 18 U.S.C. § 922(g) (Count Twenty Four) **(LATER DISMISSED)** | September 27, 2016 search warrant at 38 Windbluff Court (testimony of ATF Special Agents James Keay, Aanonsen, and Collier) |
| LOCKLEY | Distribution of cocaine base, 21 U.S.C. § 841 (Count Ten) | March 10, 2016 controlled purchase (testimony of Agent Moore, BPD Chemist Obot, and W.B.) |
| DAVIS | Possession of firearms and ammunition by a felon, 18 U.S.C. § 922(g) (Count Sixteen) | April 26, 2016 arrest in Baltimore County (testimony of BCPD Det. Philip Wilson and Agent Collier) |
| | Possession of firearm and ammunition by a felon, 18 U.S.C. § 922(g) (Count Thirty) | February 24, 2017 arrest by U.S. Marshals Task Force (testimony of Sgt. Nayim Sadik and Agent Collier) |
| | Possession with intent to distribute cocaine base. 21 U.S.C. § 841 (Count Thirty-One) | February 24, 2017 arrest by U.S. Marshals Task Force (testimony of Sgt. Nayim Sadik and BPD Chemist Monique Pitts) |
| | Possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c) (Count Thirty-Two) | February 24, 2017 arrest by U.S. Marshals Task Force (testimony of Sgt. Nayim Sadik and Agent Collier) |

### D.     The Frazier Re-Trial

FRAZIER was retried on February 24, 2020.  During trial, which spanned roughly a week and a half, the government called 14 witnesses and introduced 174 exhibits.  *See* Exhibit 5 (Gov't Trial Ex. List, Frazier, ECF 1450).  Again, Louvado was not called as a witness.  In fact, the government did not introduce any wiretap calls or evidence of FRAZIER's association with MMP.

Instead, the focus of the trial was the August 10, 2016 murder of Ricardo Johnson.  Prior to trial, in order to streamline its case, the government brought a Third Superseding Indictment that struck the racketeering conspiracy charge against FRAZIER and instead added a count charging him with possession and use of a firearm in furtherance of a drug trafficking crime, resulting in Johnson's death, in violation of 18 U.S.C. § 924(j).  Below, we provide a summary of the highlights of the evidence introduced at trial:

On August 10, 2016, at roughly 6:25 a.m., Ricardo Johnson's body was discovered in the back of a stolen van parked beside the light rail tracks in the 2200 block of Kloman Street in Baltimore.  Johnson's wrists and ankles had been bound, and he had been shot over twenty times in the head, neck, torso, and buttocks.  BPD Homicide Detective Gary Niedermeier responded to the scene and recovered numerous 9mm caliber casings from in and around the vehicle.  Detective Niedermeier also obtained 911 calls indicating that the victim had been abducted from outside his residence at 1101 W. Lanvale Street at approximately 2:30 a.m. that morning, while he was on the phone with his girlfriend.  Johnson's girlfriend heard what sounded like a scuffle and impassioned voices, and then the phone abruptly hung up.  She immediately called 911 and ran to the scene, but neither she nor police could locate Johnson.

Later on the day of the murder, shortly after 5:00 p.m., BPD Officer David Jones attempted to stop FRAZIER for riding an illegal dirt bike in the 2100 block of Tucker Lane.  FRAZIER fled on foot and, in the process, abandoned the dirt bike as well as a backpack and gloves he had been wearing.  FRAZIER was able to evade arrest, but Officer Jones obtained video footage of FRAZIER on the dirt bike from nearby surveillance cameras.

The backpack FRAZIER abandoned was found to contain a jacket, two cell phones, and two loaded 9mm caliber handguns—a Smith & Wesson and a Taurus.  BPD Firearms Examiner

Daniel Lamont determined that the firearms were a ballistic match to the 9mm caliber casings from the murder scene.  Detective Niedermeier obtained a warrant for FRAZIER's DNA in order to conduct a comparison with DNA swabs from the jacket and gloves.  BPD Forensic Biologist Virginia Sladko determined that FRAZIER's DNA was on the jacket and the insides of the gloves, and the victim's DNA was on the outsides of the gloves.

Detective Niedermeier later obtained a search warrant for the two cell phones from the backpack.  The phones contained photographs, videos, text messages, and contact information making clear that they belonged to FRAZIER.  They also contained pages of text messages indicating that FRAZIER was in the business of distributing heroin and crack cocaine, and that he was working with DAVIS.  Finally, they contained dozens of text messages and phone calls linking FRAZIER to the Ricardo Johnson homicide.  For instance, on August 5, five days before the murder, FRAZIER received a text message telling him to "Get a box of rubber gloves" because "We don't want to touch nuffn."  FRAZIER replied, "that's a mandatory."  The same day, FRAZIER sent a text message to DAVIS asking him to "Grab three black Jimmy macs"—which TFO Christopher Faller testified was commonly used street terminology for guns.  Within hours after the murder, FRAZIER got another text message from the same person who had asked him to get gloves before the murder—this time attaching screenshots of a news article about the murder, titled, "Search for witnesses after man found fatally shot in back of minivan by light rail station." At that point, Ricardo Johnson's body had not yet been identified.  Moreover, the crime happened in a part of town remote from where FRAZIER resided and spent most of his time.  Accordingly, there was no particular reason for FRAZIER to be interested in news articles about the murder—other than that he committed it.

FBI Special Agent Mathew Wilde analyzed cell site location data for FRAZIER's two cell

phones from the backpack.  The data showed that FRAZIER was in the area of the victim's residence at 1101 W. Lanvale Street shortly before the abduction occurred, and that he was in South Baltimore not far from the murder scene shortly after the victim's body was found.  Again, the murder scene was a long ways away from FRAZIER's usual haunts.

On January 25, 2017, Agent Moore arrested FRAZIER outside 7002 Arundel Mills Circle, Catonsville, Maryland on a federal warrant for possession of firearms and ammunition by a felon. The warrant was based on the August 10, 2016 dirt bike chase and the recovery of the two 9mm caliber firearms.  In a search of FRAZIER's person incident to his arrest, Agent Moore recovered approximately 5 grams of heroin and fentanyl, marijuana, and three cell phones.

After his arrest, FRAZIER waived his *Miranda* rights and took part in a videotaped interview with Detective Niedermeier and Agent Moore.  During the interview, FRAZIER made a series of demonstrably false statements.  For instance, when asked about the dirt bike chase on August 10, 2016, FRAZIER claimed that the person on the bike was not him, and that he never rode dirt bikes or wore gloves.  But publicly accessible Facebook and Instagram photographs showed FRAZIER sitting atop dirt bikes, while wearing gloves.  In addition, when shown a photograph of the victim, FRAZIER denied knowing him.  However, the victim's phone contained dozens of contacts with FRAZIER in the months leading up to the murder.

On November 16, 2017, in connection with an unrelated investigation, Detective Niedermeier searched a vacant house at 961 Bennett Place that was known to be used as a stash house by FRAZIER.  Among other evidence, he recovered a Taurus gun box, a box of Magtech .25 caliber ammunition, additional .38 caliber ammunition, two gun holsters, a spoon with white powder residue, two sifters, plastic gloves, bags of empty vials and gelatin capsules of the type commonly used to package narcotics, razor blades with white powder residue, gelatin capsules

containing white powder, and an expired ATM card in the name of "Sydni D. Frazier."  The ATM

card was sitting on top of a mirror coated in white powder residue amidst all the other contraband.

The serial number on the Taurus gun box matched the serial number on the Taurus 9mm caliber

firearm recovered from FRAZIER's backpack and used to kill Ricardo Johnson.

       The jury also heard from cooperating witness M.L., who was a member of the same drug

trafficking conspiracy as FRAZIER and had purchased heroin from FRAZIER on a number of

occasions.  M.L. testified that the victim, who went by "Uncle Rick," was known around the

neighborhood as a flashy heroin dealer.  A few days before the murder, M.L. was hanging out with

FRAZIER, DAVIS, and another member of the drug trafficking conspiracy in the Windsor Forest

apartment complex.  M.L. heard FRAZIER tell the others that he wanted to "kidnap" and "rob"

Uncle Rick.  In the days after the murder, FRAZIER came back around the area with an unusually

large bag of heroin in his possession, and he gave some of it out to other members of the drug

trafficking conspiracy.  FRAZIER also told M.L. that "he had got him"—referring to Uncle Rick.

***

       Of the government's 174 trial exhibits, only 5 (2.9%) were derived from warrants authored

by Louvado.  These were: excerpts from one of FRAZIER's cell phones recovered by Agent Moore

on January 25, 2017 (CELL7A), three posts from FRAZIER's Instagram account "Getmnyboy"

(IG15, IG16, and IG18), and excerpts from one of DAVIS's cell phones recovered by Sgt. Sadik

on February 24, 2017 (CELL3A).  As to the last exhibit, FRAZIER would have no standing to

contest the warrant for DAVIS's cell phone.  The evidence introduced at trial that flowed from the

Louvado-authored warrants related almost exclusively to FRAZIER's involvement in the heroin

trafficking conspiracy charged in Count One, and not to the murder of Ricardo Johnson charged

36

in Count Three.  Moreover, as discussed further below, the evidence was entirely cumulative of

other evidence of FRAZIER's involvement in heroin trafficking.

### E.       The Gun Trace Task Force (GTTF) Prosecution

In 2016, the U.S. Attorney's Office launched a significant corruption probe into the BPD's

Gun Trace Task Force ("GTTF").  One of the challenges during the GTTF investigation was the

possibility that information might be developed about BPD officers who were personally known

to members of the U.S. Attorney's Office or their law enforcement partners.  The fact that the case

involved police targets raised the possibility that even inadvertent or innocent mentions or

discussions of information might lead to a leak, which in turn would cause prospective corruption

targets to become aware of the investigation against them.  Such a leak would have ruined any

possibility of proactive investigation, such as undercover operations and wiretaps.

Given the nature of the GTTF investigation, which involved numerous covert investigative

operations, there was a serious need to maintain operational security, even within the law

enforcement agencies that were conducting the investigation.  Information about prospective

GTTF targets was closely protected within the Federal Bureau of Investigation, within the

components of the Baltimore Police Department that were working on the case, and within the

U.S. Attorney's Office.

Maintaining a high level of confidentiality was the only way to protect the integrity of the

GTTF investigation, which, as the Court is aware, was a wide-ranging probe into misconduct by

law enforcement officers.  Fourteen former law enforcement officers have been prosecuted during

the GTTF case (some of whom, like Louvado, were not actually members of GTTF).  Many of

those prosecutions might never have occurred but for the substantial steps taken by the government

to maintain operational security.  As a consequence, many of those corrupt former law enforcement

officers might have escaped justice.

At the same time, the government remained under an obligation to meet its discovery obligations in pending criminal cases, including those set forth in *Brady v. Maryland*, *Giglio v. United States*, the Jencks Act, and the Federal Rules of Criminal Procedure.  Mindful of the need to ensure that it met its discovery obligations in pending criminal matters (in particular to address any *Giglio* issues that might arise if a police witness in one federal prosecution were implicated simultaneously in the GTTF case), the U.S. Attorney's Office made the decision to filter any GTTF-related information about prospective law enforcement witnesses through its supervisory chain of command, rather than allowing individual line AUSAs direct access to that information.

On February 23, 2017, a federal grand jury returned an initial indictment charging seven BPD officers with racketeering conspiracy and racketeering.  *See United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019).  The seven defendants—Momodu Gondo, Evodio Hendrix, Daniel Hersl, Wayne Jenkins, Jemell Rayam, Marcus Taylor and Maurice Ward—all had been members of GTTF.  *Id.*  This indictment was returned roughly five months after the MMP indictment.  At the time of the GTTF indictment, the government did not have any information indicating that then-TFO Louvado might have been involved in any wrongdoing with the GTTF defendants (or otherwise).  In fact, prior to July 17, 2017—roughly ten months after the MMP indictment and four months after the last warrant sworn by Louvado—there was not so much as a mention of Louvado in any capacity during the GTTF investigation.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████









███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

On May 30, 2018, GTTF investigators interviewed Louvado for the first time.  *See* Exhibit 10 (FBI 302 Report, 5/30/2018 Louvado Interview).  That interview was conducted two days prior to the motions hearing in the instant matter, and was timed, in part, because it was believed necessary to question Louvado about the Trenell Murphy investigation prior to making any decision to call Louvado as a witness at the MMP motions hearing.  Louvado denied any knowledge of criminal activity by Jenkins.  *Id.* at 2.  The FBI 302 states that Louvado recalled being present for the Trenell Murphy arrest, but denied any knowledge of any theft taking place.  Specifically, the reports indicates that, "Louvado did not take or receive any money and if he has seen Jenkins or anyone else take money, he would have put an immediate stop to it."  *Id.* at 3.

In advance of the June 1, 2018, motions hearing in the MMP case, trial AUSAs Hoffman and Perry inquired with AUSA Hanlon (the Giglio Officer at the time) about whether any of their anticipated motions hearing witnesses (including Louvado) had been implicated during the then-pending GTTF investigation.  As discussed above, the GTTF investigation was highly sensitive in nature.  As such, the line AUSAs in the Office generally were not kept apprised of developments in the GTTF investigation.  Rather, the GTTF prosecutors would routinely inform the Criminal Chief (AUSA Harding) about the subjects of their investigation, and he would in turn alert the Giglio Officer as needed.  As for the line AUSAs, a procedure was set up whereby AUSAs would make a request of the Giglio Officer, who would then make an inquiry of the GTTF prosecutors, who would then report back to the Giglio Officer any potential information that might need to be

disclosed.

Because of the absence of any corroborated accusation against Louvado, Giglio Officer AUSA Hanlon advised the trial AUSAs that there was no *Giglio* or other discovery obligation with respect to Louvado from the GTTF investigation in advance of the motions hearing. Louvado did

testify during the motions hearing, but only with respect to certain statements made by defendant

Devon Dent, who subsequently pled guilty.[28]



███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████

As discussed above, the MMP trial commenced on March 18, 2019, and proceeded through the guilty verdicts on April 30, 2019.  Prior to trial, AUSAs Hoffman and Perry inquired with the *Giglio* Officer (who at that time was AUSA Schenning) and AUSA Hanlon whether there was any impeachment information about possible trial witnesses, including Louvado.  They were not advised of any material changes in the GTTF investigation as it related to Louvado.  Nonetheless, AUSAs Hoffman and Perry ultimately decided not to call Louvado as a witness during the trial. The decision was made not because of anything having to do with the GTTF investigation, but because Louvado did not have any useful, first-hand knowledge about any of the trial defendants that was not already covered by the testimony of other officers.  Louvado never testified against any of the trial defendants at any proceeding (whether in the grand jury, at the motions hearings, or at trial).

AUSAs Hoffman and Perry inquired of AUSA Hanlon whether any *Giglio* obligations arose as to Louvado in light of their determination that he was not going to be called as a witness. AUSA Hanlon advised them that if they were not calling Louvado as a witness in the MMP trial, there were no *Giglio* obligations with respect to him in that case.

On April 9, 2019, roughly three weeks into the MMP trial, the GTTF investigators received information that changed the state of information concerning Louvado.  ███████████████

███████████████████████████████████████████████████

███████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ This

was the first allegation of wrongdoing specifically directed at Louvado by a witness with first-hand knowledge.

The information was relayed to USAO supervisors.  Aware that the MMP trial was ongoing, USAO supervisors confirmed with the MMP trial AUSAs that Louvado was not going to be called as a witness.  As previously decided, the trial AUSAs confirmed that they were not calling Louvado as a witness.  The trial AUSAs did relay that they had introduced evidence from wiretaps on which Louvado had been an affiant.  AUSA Hanlon advised AUSAs Hoffman and Perry that, provided that Louvado was not called as a trial witness, no *Giglio* obligation existed.[31] That advice was based not only on the fact that Louvado was not a witness in the case, but also on the fact that the information in the Louvado affidavits was independently verifiable.  Of course, if Louvado had been called as a witness, or if the GTTF investigation had uncovered any potentially exculpatory evidence at to the trial defendants, AUSA Hanlon would have advised the trial AUSAs to make a disclosure, whether *in camera* or in some other fashion.  As it was, the newly-received information about Louvado bore on the credibility of a non-witness, and was completely unrelated to the facts of the MMP investigation.

Moreover, as was the case throughout the GTTF investigation, there was a continuing need



for investigative confidentiality with respect to the new information pertaining to Louvado. Investigators had received the first direct allegation of criminal activity by Louvado ███████ ████████████ on April 9, 2019.  At that point, the GTTF investigators were considering covert investigative steps, including locating and interviewing a potential corroborating witness concerning the cocaine theft, as well as a potential plan to seize Louvado's cellular phone. Providing advance disclosure to Louvado or defense counsel regarding those measures would have interfered with both goals.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████

On January 6, 2020, the USAO officially opened a confidential matter specifically against Louvado as a criminal target.  On March 11, 2020, the government filed a criminal information against Louvado for lying to investigators about the Murphy theft.  *See United States v. Louvado*,

CCB-20-0098 (D. Md.).  The case remains pending.

As discussed above, the re-trial of Sydni Frazier took place from February 24 through March 3, 2020.  As before, the government did not call Louvado as a witness during that trial.  As such, there was no need to revisit the previous guidance that trial AUSAs Hoffman and Perry were given by the *Giglio* Officer, AUSA Hanlon.

The government has never had any indication, whether in Louvado's proffers, the GTTF investigation, or other investigations, that Louvado engaged in any misconduct during the MMP investigation.  There also has never been any allegation by any of the defendants that Louvado engaged in any misconduct during the MMP investigation.

## F.      The Powell/Fitzgerald Case

As noted above, the trial defendants argue in a supplemental filing that the government had reason to doubt Louvado's credibility based on pretrial litigation in the 2009 cases of *United States v. Tyrone Powell and Gregory Fitzgerald*, Crim. No. BL-09-0373 (D. Md.), and *United States v. Gerrod Davis*, Crim No. CCB-09-0400 (D. Md.).  As to the *Powell/Fitzgerald* case, publically available information demonstrates the basis for the dismissal, which is contrary to defendants' allegations.  Specifically, on June 30, 2009, Powell and Fitzgerald were indicted for possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841.  ECF 20.  The defendants filed motions to suppress (ECF 27), and a hearing was held on November 3–4, 2009.  During the hearing, defense counsel argued that then-Detective Louvado had lied about observing a suspected hand-to-hand transaction involving Fitzgerald, and had used that transaction as a pretext for a car stop of a vehicle occupied by Powell and Fitzgerald, and from which narcotics evidence was recovered.  *See* Exhibit 16 (Powell/Fitzgerald Joint Appendix), at 169–96.  The government argued, in response, that Louvado's testimony was clear and was not contradicted by the evidence.

*Id.* at 196–212.

Judge Legg ruled in the government's favor, denying the motion to suppress by written order dated November 5, 2009.  *Id.* at 232.  The Court originally intended to follow up that order with a written memorandum opinion.  *Id.*  However, subsequent to the order, the government and defendant Powell entered into a plea agreement, and the government elected to dismiss the charges against defendant Fitzgerald.   Accordingly, Judge Legg stated the reasons for his denial of the motion to suppress in an oral ruling in advance of Powell's guilty plea/sentencing proceeding on November 9, 2009.  *Id.* at 251–60.

Judge Legg's ruling reflected that the Court credited Louvado's testimony about the events leading up to the car stop, and determined that the government had sustained its burden of showing legal justification for the police actions that led to the recovery of the drugs in question.  The Court called Louvado's testimony "clear and emphatic."  *Id.* at 259.  The Court concluded that the defense had "chipped around the edges" of the testimony, but had "not overcome . . . the credibility of [Louvado's] testimony" about the hand-to-hand drug transaction that occurred.  *Id.*

Judge Legg conducted a guilty plea/sentencing hearing after ruling on the motion to suppress.  *Id.* at 260–64.  Powell pled guilty to possession with intent to distribute cocaine, and received a 96-month sentence, consistent with a Rule 11(c)(1)(C) agreement with the government. *Id.* at 274.

Following Powell's guilty plea, the government dismissed the indictment against co-defendant Fitzgerald.  ECF 63.  The government put the reasons for its dismissal of the Fitzgerald case on the record during the Powell guilty plea/sentencing proceeding.  Government counsel explained that Fitzgerald was under investigation in another matter, that a separate, future indictment was possible as to Fitzgerald, and that the government was electing not to proceed on

the then-existing charges against Fitzgerald in the interests of justice.   Ex. 16, at 247–49.
Fitzgerald was later indicted and pled guilty in *United States v. Fitzgerald*, WDQ-12-289 (D. Md.).

In sum, the record in the Powell/Fitzgerald litigation does not support the defendant's allegation that the government had reason to doubt Louvado's credibility as of 2009.   The government won the motions hearing, both defendants ultimately pled guilty, and there was no negative credibility finding as to Louvado.

### G.   The Davis Case

As to the *Davis* case, the defendant was indicted on charges of possession with intent to distribute cocaine and heroin on July 21, 2009.   ECF 1.   The defendant filed a motion to suppress and a motion for a *Franks* hearing.   ECF 14, 15.   The defendant argued that then-Det. Louvado provided discrepant accounts as to events he observed on February 3, 2009.   Specifically, Louvado indicated he observed the defendant conduct a suspected drug transaction in the area of 307 East 31st Street in Baltimore at approximately 10 p.m.   On the basis of this and other observations, law enforcement received authorization to execute a search warrant on the residence, where they found Davis as well as suspected narcotics.   The defendant claimed to have cell phone records indicating he was not in the area on February 3, 2009 at 10 p.m.   Ultimately, the government (then-AUSA Jackson) dismissed the case as to Davis, prior to any motions hearing or testimony.   ECF 18.   No reason was stated in the dismissal motion or on the record.   Again, the record in the *Davis* litigation does not support the Defendants' inferences, or indicate that there was any adverse credibility finding as to Louvado.

### III.    ARGUMENT

#### A.    The Evidence Set Forth in the Louvado Information Is Mere Impeachment Evidence As to a Non-Witness That is Not Material to the Issues and Would Not Have Altered the Outcome at Trial

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial to that defendant if the interests of justice so requires."  Fed. R. Crim. P. 33(a).  The Fourth Circuit has held that in order for newly discovered evidence to warrant a new trial, five requirements must be met, namely:

> (a) the evidence must be, in fact, newly discovered, *i.e.*, discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such a nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) (quoting *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993)).  The defendant must demonstrate that all five so-called "*Custis*" factors are met.  *See id.*

The Fourth Circuit's decision in *Robinson* is instructive, so we begin with a full discussion of the case.  Robinson was convicted of drug trafficking and firearms charges related to a crack cocaine distribution network after a five-day jury trial.  *Id.* at 944–45.  After trial, the government learned that four officers who had participated in the investigation had engaged in various misconduct, including stealing police funds to pay for drinks and dancers at clubs, and failing to log drugs purchased by an informant.  *See id.* at 946–47.  The officers, who were dismissed as a result of the misconduct, had testified in support of warrants upheld at a suppression hearing, and had also testified at trial.  *See id.* at 946–47, 950.  The misconduct occurred during the same general time period that the officers were involved in the Robinson investigation, but was unrelated to the case.  *See id.* at 946–48.  On appeal, Robinson argued that the police misconduct warranted a new

trial on all counts under Rule 33.  *Id.* at 948.  Like the defendants here, he argued that "the dismissed officers were so central as to alter the government's whole case," and that evidence of their misconduct would have led "the search warrants and their fruits [to be] thrown out" and "the testimony of the dismissed officers [to] be questioned."  *Id.* at 950.

The Fourth Circuit disagreed, ruling that Robinson could not satisfy *Custis*'s third, fourth, or fifth factors.  *Id.* at 951.  The Court found, first, that the misconduct evidence was "mere impeachment evidence" that could not be used to justify a new trial under Rule 33.  *Id.* at 948–49.  The Court reasoned that the evidence did not "directly support some alternate theory of the crimes" or "provide any legal justification for Robinson's actions."  *Id.* at 949 (citing *United States v. Fulcher*, 250 F.3d 244, 250–51 (4th Cir. 2001)).  Rather, it was "offered to cast doubt on the testimony of the dismissed officers and the evidence they helped to collect, about as textbook an example of impeachment evidence as there could be."  *Id.* (citing *Custis*, 988 F.2d at 1359–60).  The Court reiterated the general rule that mere impeachment evidence is not enough to warrant a new trial.  The sole exception is "the rare case" in which "the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases."  *Id.* (quoting *Custis*, 988 F.2d at 1359).  As the Court explained, Robinson did not fit into this category, and therefore could not demonstrate his entitlement to a new trial.  The Court concluded:

> The dismissed officers' testimony was amply corroborated by that of other law enforcement officials and Robinson's associates.  Moreover, the officers' misconduct, while serious, did not relate to Robinson's case or to the truth-finding function of the criminal proceeding.  We thus reiterate our reluctance to order retrials because of subsequently discovered impeachment evidence.  To do so would invite fishing expeditions into the backgrounds of witnesses and insubstantial Rule 33 motions resulting therefrom.  Such a development could deprive witnesses of a decent sense of closure and undermine the finality of criminal proceedings to an unacceptable degree.

*Id.*; *see also id.* at 949 ("Misconduct evidence like this, which involved witnesses in Robinson's case but did not relate to those witnesses' investigation of that case, is likely to push the parties toward miniature credibility trials and to cut into the limits the Rules of Evidence place on information about diversionary and subsidiary issues.").

Moving to the fourth and fifth *Custis* factors, the Court found that Robinson could not demonstrate that the misconduct evidence was "material" or that it would "probably produce an acquittal." *Id.* at 949–51. The Court emphasized that the dismissed officers "played only bit parts" in the overall investigation, that other federal investigators "did the lion's share of the work," that the misconduct evidence conveyed "little about Robinson's guilt or innocence," and that there was an "impressive amount of evidence against him from other sources." *Id.* at 950. The Court concluded: "It strains credulity to claim that evidence regarding the unrelated misconduct of a few of the officers who testified at Robinson's trial could have undermined Robinson's thoroughly demonstrated guilt." *Id.* at 951.

Finally, the Court rejected the defendants' *Brady* and *Giglio* claims. The Court found, first, that the officers' knowledge of their own misconduct could not be imputed to the prosecutors. *Id.* at 951–52. Furthermore, the Court found that the misconduct evidence did not meet *Brady*'s materiality requirement, as "numerous other law enforcement officers and more than a dozen co-defendants or cooperating witnesses corroborated each other's testimony and the physical evidence demonstrating Robinson's crimes." Accordingly, the Court concluded, "[e]vidence regarding a few officers' unrelated misconduct could do little to damage the extensive physical and testimonial foundation of the case." *Id.* at 952–53.

Here, as in *Robinson*, the defendants do not come close to satisfying *Custis*'s third, fourth, and fifth factors.

### 1.    The Newly Discovered Evidence Is Mere Impeachment Evidence

First, the newly discovered information about Louvado is mere impeachment evidence—*i.e.*, evidence that casts doubt on Louvado's credibility as a witness but has no relationship to the facts of the case.[32]  The misconduct at issue occurred in 2009—a full seven years before Louvado's involvement in the MMP investigation.  The evidence does not support an alternate theory of the defendants' crimes, provide legal justification for the defendants' actions, or exculpate the defendants in any way.  As in *Robinson*, the misconduct, while serious, is "about as textbook an example of impeachment evidence as there could be."  *Robinson*, 627 F.3d at 949.  And this is clearly not the "rare case" in which the government's entire case rested on a single, uncorroborated witness.  *Id.*  To the contrary, Louvado was *not* among the government's 60 trial witnesses, and the factual material in Louvado's affidavits was independently verified by dozens of other law enforcement witnesses who testified credibly at trial.  For this reason alone, the defendants cannot demonstrate that they are entitled to a new trial.

### 2.    The Newly Discovered Evidence Is Not Material

Second, the newly discovered misconduct evidence is not "material to the issues involved." *Robinson*, 627 F.3d at 948.  The thrust of the defendants' argument is that the misconduct evidence would have enabled them to mount a successful challenge to the Louvado-authored wiretaps and warrants under *Franks v. Delaware*, 438 U.S. 154 (1978).  There are a number of problems with this argument.

As a preliminary matter, ten of the twenty-two Louvado-derived exhibits introduced at trial stemmed from warrants that the trial defendants did not have standing to challenge.  *See* Gov. Tr.

---

[32]    Indeed, it is impeachment evidence about a *non*-witness—which may not come within the ambit of Rule 33 at all.

Ex. CELL4, CELL4A, D22, SW13, CELL9, CELL9A, SW8, F20, F20A.  The defendants had no reasonable expectation of privacy in the residences of Ayinde Deleon, Dwight Jenkins, or Melvin Lashley, all of whom pled guilty prior to trial.  For this reason alone, they would not have succeeded in suppressing the evidence recovered as a result of these warrants.

With respect to the Louvado-authored warrants that the defendants *did* have standing to challenge, their *Franks* claim does not pass muster.  *Franks* set forth "certain narrowly defined circumstances [in which] a defendant can attack a facially valid warrant."  *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990).  In order to establish entitlement to a *Franks* hearing, a defendant must make "a substantial preliminary showing that [1] a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [2] the allegedly false statement is necessary to the finding of probable cause."  *Franks*, 438 U.S. at 155–56.  In order to prevail at a hearing, the defendant must prove both points by a preponderance of the evidence.  *United States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011).  Here, the defendants cannot point to a single factual inaccuracy in any of the Louvado-authored affidavits that was material to the probable cause determination.  The best they can do is point to an omission—namely, Louvado's failure to disclose that he had participated in a theft of drugs in 2009, seven years earlier.

It is true, as the defendants point out, that the *Franks* test also applies when an affiant intentionally or recklessly omits material facts that render the affidavit misleading.  *See Colkley*, 899 F.2d at 300.  But the Fourth Circuit has made clear that "the *Franks* threshold is even higher for defendants making claims of omissions rather [than] affirmative false statements."  *Clenney*, 631 F.3d at 664; *see also United States v. Tate*, 524 F.3d 449, 454–5 (4th Cir. 2008).  As far as the government is aware, there has *never* been a case that has applied the *Franks* test to an affiant's

omission of *impeachment* evidence such as this—*i.e.*, evidence of past police misconduct that bears on the affiant's credibility but has no relationship to the facts of the case. The defendants certainly do not cite to any such cases. All of the cases cited by the defendants dealt with omissions of potentially *exculpatory* evidence. *See United States v. Jones*, 942 F.3d 634, 641 (4th Cir. 2019) (affirming the district court's denial of a *Franks* hearing where the affiant omitted certain online statements made by the defendant that allegedly cast his threats in a less incriminating light, finding that the statements were immaterial to the probable cause determination); *Tate*, 524 F.3d at 457 (holding that the defendant was entitled to a *Franks* hearing where the affiant failed to disclose that the sole evidence of the defendant's criminal activity—drug evidence from his trash—was obtained via an illegal trespass); *United States v. Wharton*, 840 F.3d 163, 166–71 (4th Cir. 2016) (affirming the district court's denial of a *Franks* challenge based on the affiant's failure to disclose allegedly exculpatory evidence that the defendant occupied a different part of the house than was searched, finding that the omissions did not defeat probable cause).

The defendants attempt to construe *United States v. Lull*, 824 F.3d 109 (4th Cir. 2016), as a case involving a successful *Franks* challenge based on the omission of impeachment evidence, but the case is readily distinguishable. In *Lull*, the probable cause for the warrant at issue was based on a controlled purchase of drugs from the defendant, Lull, by a confidential informant. *Id.* at 112–13. The affiant did not disclose that the informant had attempted to steal some of the money police had given him to make the controlled purchase at issue. *Id.* The Fourth Circuit held that the omission invalidated the search warrant because "the only evidence identifying Lull as the seller of the drugs in the affidavit came from an informant who had been deemed unreliable." *Id.* at 117. In reaching this conclusion, the Court relied on the fact that "the informant's theft was not 'separate' from the controlled buy"; rather, "[t]he informant demonstrated that he was unreliable

during the course of this very transaction." *Id.* at 116.  Thus, *Lull* involved evidence that is more

aptly described as exculpatory rather than merely impeaching.  It dealt with the failure to disclose

dishonest behavior by an informant during the very transaction that served as the basis for probable

cause—not the failure to disclose unrelated misconduct by an affiant years in the past.

The defendants also rely on *Colkley*, *supra*.  But the analysis in *Colkley* explains why their

motions must fail.  In *Colkley*, the Fourth Circuit held that the defendant was not entitled to a

*Franks* hearing notwithstanding the omission of exculpatory evidence that was far more relevant

to the probable cause determination than the omission at issue here.  *Colkley*, 899 F.2d at 299–

300.  In *Colkley*, an FBI agent obtained an arrest warrant for the defendant based largely on

eyewitness descriptions of a robbery and composite descriptions of the two suspects.  *See id.* at

299.  The agent failed to mention that six eyewitnesses were unable to identify the defendant in a

photospread (and three, in fact, identified others in the photospread as similar to the robber).  *Id.*

The Fourth Circuit held that the district court "need not have held a *Franks* hearing" because "there

was no substantial preliminary showing that the affiant intended to mislead," and "inclusion of the

omitted information would not have defeated probable cause in any event."  *Id.* at 299–300.  In

doing so, the Court reasoned:

> [T]he affirmative inclusion of false information in an affidavit is more likely to
> present a question of impermissible official conduct than a failure to include a
> matter that might be construed as exculpatory.  This latter situation potentially
> opens officers to endless conjecture about investigative leads, fragments of
> information, or other matter that might, if included, have redounded to defendant's
> benefit.  The potential for endless rounds of *Franks* hearings to contest facially
> sufficient warrants is readily apparent.

*Id.* at 301.  *Colkley*'s reasoning carries all the more weight when it comes to omissions of

impeachment evidence as opposed to exculpatory evidence.  If the defendant's theory were to carry

the day, affiants would be required to include, in every warrant application, a laundry list of every

instance or allegation of past misconduct that might bear on their credibility.  Warrants would be endlessly re-litigated whenever any new allegation surfaced that an affiant may have engaged in past misconduct.  That cannot be the law.  A warrant is meant to establish a "fair probability that contraband or evidence of a crime will be found in a particular place," *Illinois v. Gates*, 462 U.S. 213, 218 (1983), not to serve as a forum for continual attacks on the affiant's credibility.

For all of these reasons, it is highly doubtful that the defendants here would have succeeded in making the showing necessary to obtain an evidentiary hearing under *Franks*.  But even if there *had* been a *Franks* hearing, it is quite clear that the warrants would have been upheld.  That is because numerous other officers would have testified to the veracity of the statements in Louvado's affidavits.  Agent Moore, Agent Aanonsen, TFO Faller, Detective Niedermeier, Sergeant Sadik, Daniel Lamont, Virginia Sladko, and others would have testified about (a) the controlled purchases that served as the basis for the TT1 and TT2 wiretaps; (b) the controlled purchases, wire calls, confidential source information, and surveillance operations that served as the basis for the Takedown Warrant; (c) the circumstances of FRAZIER's arrest on January 25, 2017 and the Ricardo Johnson homicide investigation that served as the basis for the Frazier 1/25/17 Cell Phone Warrant and the Frazier getmneyboy IG Warrant; and (d) the circumstances of DAVIS's arrest on February 24, 2017 and the social media posts that served as the basis for the Davis 2/24/17 Cell Phone Warrant and the Davis fh_dinero IG Warrant.  Their testimony would have been corroborated by a wealth of audio, video, photographic, and other physical evidence. Indeed, that is exactly what happened at the trials in March 2019 and February 2020.

There is a yet another problem with the defendants' materiality theory.  Even if the defendants had mounted a successful *Franks* challenge to the Louvado-authored wiretaps and warrants, it does not follow that all the evidence would have been excluded at trial.  With respect

to four of the warrants—the Frazier 1/25/17 Cell Phone Warrant, the Davis 2/24/17 Cell Phone Warrant, the Frazier getmneyboy IG Warrant, and the Davis fh_dinero IG warrant—the government simply would have obtained new warrants using exactly the same probable cause statements, sworn to by another officer such as Agent Moore or Agent Aanonsen.  As discussed above, nothing in the warrants depended on Louvado's personal observations.  Indeed, the vast majority of the factual material in the warrants was simply relayed to him by other officers such as Agent Moore and Agent Aanonsen.

### 3.    The Newly Discovered Evidence Would Not Have Produced an Acquittal

Third, and finally, the defendants cannot demonstrate that the misconduct evidence "would probably produce an acquittal."  *Robinson*, 627 F.3d at 948.  Even accepting the defendants' faulty premise that all the evidence derived from the Louvado-authored wiretaps and warrants would have been suppressed, that evidence was immaterial to the outcome at trial because it was cumulative of reams of other evidence.  Had the Louvado-derived evidence been completely excised from the government's case, there still would have been overwhelming evidence of the defendants' guilt on all counts of conviction.  We address each of the trials in turn below:

### i.    Trial of Bailey et al.

The Louvado-derived evidence introduced at trial was both quantitatively and qualitatively unimportant.  As discussed above, only 22 exhibits derived from Louvado-authored warrants were introduced, representing less than 3% of the government's 748 trial exhibits.  These 22 exhibits were cumulative of staggering amounts of other evidence establishing the defendants' guilt.

As a preliminary matter, none of the 22 Louvado-derived exhibits implicated BAILEY or BANKS in any fashion.  Neither BAILEY nor BANKS was intercepted in any TT1 or TT2 wiretap calls, and the other cell phone records, social media evidence, and physical evidence did not pertain

to them.  Their claims should be rejected.

The defendants greatly exaggerate the importance of the TT1 and TT2 wiretaps, which resulted in only 11 of the 111 wiretap calls introduced at trial.  Moreover, none of the trial defendants were intercepted in any of the TT1 or TT2 wiretap calls except for LOCKLEY.  LOCKLEY was intercepted in just 5 calls on Lines TT1 and TT2, whereas he was intercepted in *62* calls on wiretap Lines B, D, G, and TT3.  The only other Louvado-derived evidence implicating LOCKLEY was the cell phone recovered from his residence at 1868 Oxford Square on September 27, 2016, excerpts of which were introduced as Gov. Tr. Ex. CELL11A.[33]  The excerpts consisted of text messages between LOCKLEY and various drug customers.  These text messages, like the TT1 and TT2 wiretap calls, were insignificant in light of the vast universe of evidence of LOCKLEY's involvement in drug trafficking.  For instance, there were the calls from the HSI wiretaps, including numerous calls in which Spence agreed to supply LOCKLEY with distribution quantities of heroin.  *See* D-307 (10 grams), D-554 (25 grams), D-664 (40 grams), and G-148 (50 grams).  There was the seizure of over 600 grams of heroin from Spence's stash house on July 21, 2015.  There were the TT3 wiretap calls, including dozens of calls in which LOCKLEY arranged transactions with customers, or made plans to get supplies of heroin from ANDERSON.  *See, e.g.*, TT3-3064, 3225, 4083, 4398, 4560, 5072, 5078, 6173, 7455, and 8196.  There was the testimony of LOCKLEY's drug customer B.R., who explained that he had purchased half-gram quantities of heroin from LOCKLEY and his drug hitters on a daily or near-daily basis for over a year.   There was a TT3 wire call with B.R., in which B.R. explained that the heroin LOCKLEY had just sold him had caused his sister, S.R., to overdose.  *See* TT3-3354.  S.R. also testified at trial.

---

[33]     This was the same cell phone that was the subject of the wiretap on Line TT3.

The only Louvado-derived evidence that implicated ANDERSON at trial was the Glock 9mm caliber handgun recovered from his residence at 38 Windbluff Court on September 27, 2016 pursuant to the Takedown Warrant (and photographs of its recovery).  *See* Gov. Tr. Exs. F25, SW9.  This gun was the basis of Count Twenty-Four of the Second Superseding Indictment, charging ANDERSON with possession of a firearm by a felon.  But importantly, the government *dismissed* the 922(g) count against ANDERSON following trial in light of the Supreme Court's intervening decision in *Rehaif v. United States*, 139 S. Ct. 2191 (June 21, 2019).  The gun was not important in establishing ANDERSON's guilt on the racketeering and drug conspiracy counts.  (In fact, 922(g) offenses are not RICO predicates.)  Moreover, it was cumulative of other evidence of ANDERSON's gun ownership.  For instance, both M.L. and D.H. testified that they had seen ANDERSON carrying handguns in MMP's territory in the Windsor Mill/Forrest Park neighborhood.  W.B. testified that ANDERSON supplied the firearm that Dontray Johnson used to murder Antoine Ellis on November 22, 2012, and that ANDERSON helped Johnson dispose of the gun afterward.  Indeed, ANDERSON himself admitted that he possessed the Glock 9mm caliber gun in question—and other guns—during his video-recorded post-Miranda interview. Gov. Tr. Exs. INT1, INT1B, INT1T.

As for DAVIS, the only Louvado-derived evidence implicating him at trial consisted of a handful of posts from his Instagram account, introduced as Gov. Tr. Ex. SM13, and the excerpts from his cell phone seized on February 24, 2017, introduced as Gov. Tr. Ex. CELL3A.  The Instagram posts consisted of two photographs of DAVIS holding wads of cash and two comments referencing MMP's oath ("OmertaBoyz") and headquarters ("52#FAM").  *See* Gov. Tr. Ex. SM13. They were entirely trivial compared to the other non-Louvado-derived Instagram evidence against DAVIS—for instance, the photograph of DAVIS holding a firearm with an extended magazine,

Gov. Tr. Ex. SM10, at 33–34; the photograph of DAVIS making an MMP gang sign accompanied by the caption "MURDERLAND MAFIA MOBB THE WORLD IS OURS," *id.* at 9–10; other photographs of DAVIS making MMP gang signs, *see, e.g.*, *id.* at 7, 35; a photograph of DAVIS wearing an "Omerta" t-shirt, *id.* at 35; and numerous other posts referencing DAVIS's membership in MMP, *see, e.g.*, *id.* at 30 ("Go Against the MOBB GET MURDERED"), *id.* at 32 ("What's MOBBIN"), *id.* at 29 ("#5200FAM #OmertaCode"), Gov. Tr. Ex. SM13a ("5Deuce BOSS Death Bk4 Dishonor OMERTa Code / 52Hunnit F.A.M [emojis] [G][M][B] 410Murderland"), Gov. Tr. Ex. SM13B ("Have a MOBB meeting With a MOBB BOSS #5200fam").[34]  The excerpts from DAVIS's cell phone consisted primarily of text messages with drug customers.  The texts were cumulative of reams of other evidence of DAVIS's involvement in drug trafficking—for instance, eighteen pages of text messages with drug customers from DAVIS's cell phone seized on April 26, 2016, Gov. Tr. Ex. CELL2A; text messages from Kenneth Torry's phone in which DAVIS agreed to help Torry distribute 100 grams of heroin, Gov. Tr. Ex. CELL14A, at 10–15; DAVIS's arrest on February 24, 2017 while in possession of 25 grams of crack cocaine, a loaded gun, over $1300 in cash, and four cell phones; numerous jail calls between DAVIS and FRAZIER in which they discussed drug trafficking, *see* Gov. Tr. Exs. J-3, J-4, J-6, J-69, J-70; and the testimony of multiple cooperating witnesses that DAVIS dealt heroin and crack cocaine in MMP's territories.

Perhaps realizing that the Louvado-derived evidence was insignificant to the government's case at trial, the defendants attempt to claim that *other* trial exhibits constituted "downstream evidence" and "fruit of the poisonous tree."  ECF 1505-1, at 13, 16; *see also id.* at 19 (alleging that "many of the other search warrants in this case were obtained using information from the results

---

[34]     Exhibits SM13A and SM13B were screenshots of publicly available posts from DAVIS's fh_dinero Instagram account that were acquired before the Louvado warrant was sworn out.

of these tainted wiretaps and searches"). That is simply not the case. Nothing derived from the Louvado wiretaps and warrants was necessary to the probable cause determination for any other warrant. No trial evidence other than the twenty-two exhibits described above flowed from Louvado's affidavits.

For instance, the defendants claim that wiretap line TT3 was derivative of wiretap lines TT1 and TT2. But as discussed above, Agent Moore's application for wiretap line TT3 was supported by probable cause independent of any evidence generated from the Louvado wiretaps. Specifically, it was premised on the March 10, 2016 controlled purchase of approximately 14 grams of cocaine base from LOCKLEY, which was arranged via a recorded and monitored call to LOCKLEY on TT3. The fact that Louvado's prior application was "incorporated by reference," does not defeat probable cause for this wiretap. Every mention of Louvado's application and the evidence it generated could be stricken from the TT3 application, and there still would be ample probable cause to justify interception. Therefore, none of the TT3 calls are tainted by the impeachment evidence pertaining to Louvado.

Stretching further still, the defendants suggest that evidence seized pursuant to DAVIS's February 25, 2017 arrest on federal racketeering charges was somehow derivative of the Louvado-authored warrants. Not so. The federal arrest warrant was based on Agent Aanonsen's testimony before the grand jury in support of the Superseding Indictment, in which he summarized the evidence that had been gathered prior to September 22, 2016. DAVIS had not been identified in *any* wire calls up until that point, and *none* of the Louvado warrants had even been executed. Therefore, nothing derived from Louvado-authored warrants contributed to his arrest by the U.S. Marshals Task Force on February 24, 2017. As discussed above, that arrest—when DAVIS was found in possession of a loaded gun, drugs, cash, and four cell phones—supported his conviction

on Counts Thirty, Thirty-One, and Thirty Two.

     ii.   <u>Frazier Retrial</u>

   Again, the Louvado-derived evidence at trial was both quantitatively and qualitatively unimportant.  As discussed above, only 5 exhibits derived from Louvado-authored warrants were introduced, representing less than 3% of the government's 174 trial exhibits.  These exhibits were: (1) excerpts from one of FRAZIER's cell phones seized on January 25, 2017, consisting of text messages with drug customers, Gov. Tr. Ex. CELL7A; (2) the profile information for FRAZIER's Instagram account getmneyboy, Gov. Tr. Ex. IG15; (3) a photograph of FRAZIER holding a wad of cash from his getmneyboy Instagram account, Gov. Tr. Ex. IG16; (4) an Instagram message in which FRAZIER provided a particular phone number, (443) 454-4707, which was the number associated with the phone recovered on January 25, 2017, but which bore no relationship to the murder, Gov. Tr. Ex. IG18; and (5) excerpts from one of DAVIS's cell phones seized on February 24, 2017, consisting of text messages with drug customers and certain rap lyrics, Gov. Tr. Ex. CELL3A.[35]

   These five exhibits related almost exclusively to FRAZIER's involvement in the heroin trafficking conspiracy charged in Count One, and not to the murder of Ricardo Johnson charged in Count Three.  Moreover, they were cumulative of other evidence of FRAZIER's involvement

---

[35]  DAVIS's cell phone included the following rap lyric: "Hold up flash back it was just 08 / Me & Syd kickndoors trying make sum shake / Laying niggas on the floor what's the code to the safe."  Gov. Tr. Ex. CELL3A, at 9.  The government argued that the lyric was an allusion to DAVIS and FRAZIER robbing drug dealers together and further evidence of the manner and means of their drug trafficking conspiracy.  The rap lyric was cumulative of other non-Louvado-derived jail calls and text messages indicating that FRAZIER and DAVIS robbed drug dealers together, *see, e.g.*, Gov. Tr. Ex. J-4, J-4T, CELL5A, at 17; remote in time to the homicide (2008 versus 2016), and trivial in the context of the vast amount of DNA, ballistic, video, cell phone, testimonial, and other evidence demonstrating beyond a reasonable doubt that FRAZIER murdered Johnson in furtherance of a drug trafficking crime.

in heroin trafficking—for instance (a) seizures of drugs and drug trafficking paraphernalia from FRAZIER's person and stash house on January 25, 2017 and November 16, 2017 (introduced as Gov. Tr. Exs. D1–D3 and SW1–SW12); (b) text messages discussing drug trafficking from FRAZIER's cell phones recovered on August 10, 2016, and from DAVIS's cell phone recovered on April 26, 2016 (introduced as Gov. Tr. Exs. CELL5a, CELL6a, and CELL2a); (c) numerous recorded jail calls from FRAZIER to DAVIS and others discussing drug trafficking (introduced as Gov. Tr. Exs. J1–J4, J7, J8, and J10); (d) dozens of photographs and messages from FRAZIER's Instagram account with username "rip_bigsidnbarakaat" (introduced as Gov. Tr. Exs. IG21–IG28, IG30–IG39, IG 41, IG43–IG47); and (e) testimony by M.L., a drug dealer who purchased distribution quantities of heroin from FRAZIER on multiple occasions in Fall 2017.

***

In short, as to both trials, the Louvado-derived evidence was cumulative and immaterial, and there is no probability that suppression of the evidence would have produced an acquittal on any count of conviction.  *See Robinson*, 627 F.3d at 948.  Even if the Court had stricken every piece of Louvado-derived evidence in this case, an overwhelming amount of other, non-Louvado-derived evidence established their guilt beyond a reasonable doubt.

## B. The Government Had No *Brady/Giglio* Obligation as to Louvado, Who Never Testified Against Any of the Defendants, and Whose 2009 Misconduct Has No Bearing on the Facts of This Case

The defendants also argue that they should be granted a new trial because the government committed a *Brady/Giglio* violation.  *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).  ECF 1505-1, at 22–27.  This claim, too, is meritless.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or

to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  The Court later made clear in *Giglio* that the *Brady* protection applies to undisclosed evidence bearing on the credibility of a witness whose reliability "may well be determinative of guilt or innocence." *Giglio*, 405 U.S. at 154.  In order to establish a *Brady/Giglio* violation, the defendant must demonstrate that the undisclosed evidence was: (1) "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "suppressed by the State, either willfully or inadvertently," and (3) material to the defense, such that prejudice resulted from its suppression. *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999).  Evidence is "material" for *Brady/Giglio* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

The *Brady/Giglio* right is a trial right, which "exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person [will] be found guilty." *United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010); *see also Colkley*, 899 F.2d at 299 ("*Brady* and its progeny establish that the prosecutor has a duty to disclose to the defendant exculpatory evidence, defined as material evidence that would create a reasonable doubt as to *the correctness of a guilty verdict at trial*.") (emphasis added); *United States v. Ruiz*, 536 U.S. 622, 629–33 (2002) (holding that "the Constitution does not require the government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant," reasoning that impeachment information "is special in relation to *the fairness of a trial*, not in respect to whether a plea is *voluntary*") (emphasis in original); *Bagley*, 473 U.S. at 678 ("[S]uppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial.").

The defendants do not cite—and the government is not aware of—any case holding that the government has a *Brady/Giglio* obligation to disclose impeachment evidence about a search warrant affiant who *never* testified against the defendants in any capacity, where that impeachment evidence bears *no* relationship to the facts of the case.   To the contrary, as the defendants acknowledge, the Fourth Circuit has held that "the protections of *Brady* . . . do not apply to warrant application proceedings." *Clenney*, 631 F.3d at 665 (citing *Colkley*, 899 F.2d at 302–03); *see also United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) ("Suppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment[.]'") (quoting *Brady*, 373 U.S. at 87)); *Mays v. City of Dayton*, 134 F.3d 908, 815–16 (6th Cir. 1998) (holding that it was error for the district court to import the *Brady* rationale to a search warrant affidavit that contained allegedly exculpatory omissions, reasoning that the "overriding concern of *Brady* is with the justice of finding guilt that is appropriate at trial") (citations omitted).[36]

The Fourth Circuit's decision in *Colkley* is instructive.   As discussed above, *Colkley* rejected a *Franks* challenge based on the omission of exculpatory material (a negative

---

[36]     The defendants note that the Ninth and Fifth Circuits "have applied *Brady* to warrants and suppression hearings." ECF 1505-1, at 23 n.28 (citing *United States v. Barton*, 995 F.2d 931 (9th Cir. 1993); *Smith v. Black*, 904 F.2d 950 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992)).  Importantly, however, both cases dealt with the destruction or withholding of potentially exculpatory evidence at a *suppression hearing*, not with nondisclosure of impeachment evidence regarding a non-testifying search warrant affiant.  *See Barton*, 995 F.2d at 935; *Smith*, 904 F.2d at 965–66.  In fact, the Ninth Circuit has recognized that the government has no obligation to disclose impeachment information with respect to a non-testifying witness.  *See United States v. Brown*, 728 Fed. App'x 614, 618 (9th Cir. 2018) (holding that the government did not violate *Brady* by refusing to turn over allegedly exculpatory material in a non-testifying officer's personnel file); *see also United States v. Calderon*, No. 15-1652, 2016 WL 3854228 (1st Cir. July 15, 2016) (rejecting defendant's *Brady/Giglio* claim based on prosecution's failure to disclose criminal activity by an officer who participated in the investigation, reasoning that the officer "did not testify and, hence, his unrelated criminal activity could not constitute impeachment evidence").

photospread) in an arrest warrant. *Colkley*, 899 F.2d at 299–303. The Court also declined to "import[] the panoply of *Brady* protections from trial practice into warrant application proceedings." As the Court explained:

> The *Brady* rule derives from due process and is designed to ensure fair criminal trials. *Bagley*, 473 U.S. at 675; *Brady*, 373 U.S. at 87. It is at trial that the accused is cloaked with the presumption of innocence and may put the state to its proof beyond a reasonable doubt. By contrast, the probable cause determination in *Franks*, which derives from the Fourth Amendment, involves no definitive adjudication of innocence or guilt. Because the consequences of arrest or search are less severe and irremediable than the consequences of an adverse criminal verdict, a duty to disclose potentially exculpatory information appropriate in the setting of a trial may be less compelling in the context of an application for a warrant.

> . . .

> Moreover, a requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process. The rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded. It would perforce result in perniciously prolix affidavits that would distract police officers from more important duties and render the magistrate's determination of probable cause unnecessarily burdensome. In addition, a broad duty of inclusion would turn every arrest or search into a warrant contest. Such consequences would, in turn, discourage reliance on warrants, a result the Supreme Court has stated should be avoided in shaping Fourth Amendment doctrine. *Gates*, 462 U.S. at 236–37.

> In short, a rule requiring affiants to disclose all potentially exculpatory information has nothing to recommend it. Unless the defendant makes a strong preliminary showing that the affiant excluded critical information from the affidavit with the intent to mislead the magistrate, the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity.

*Colkley*, 899 F.2d at 302–03. Thus, under *Clenney* and *Colkley*, when the defendant seeks a new trial based on the omission of allegedly exculpatory material in a search warrant, the relevant analysis is *Franks*, not *Brady*. And for all the reasons discussed in Section III.A, above, the defendants would not have been able to mount a successful *Franks* challenge to the Louvado-authored warrants.

70

Even assuming that the *Brady/Giglio* protections apply in this arena, the defendants' claim would fail.  **First**, the defendants cannot demonstrate that the Louvado misconduct evidence is truly "impeaching"—because Louvado never testified as a witness against the defendants.  And it certainly is not "exculpatory," because it has no bearing on the defendants' guilt or innocence.  This fundamental mismatch further demonstrates why the *Brady/Giglio* line of cases is not the proper framework for analyzing the defendants' claims.

It bears mentioning, too, that the defendants are wrong about the timing of the government's knowledge of Louvado's misconduct.  The defendants claim that ATF supervisors "were surely aware that one of their task force officers was under investigation by the United States Attorney's Office and the FBI" at the time Louvado swore out his wiretap and search warrant affidavits.  ECF 1505-1, at 25.  That is factually inaccurate.  As discussed in Section II.E above, Louvado was *not* under investigation at the time.  The government did *not* know anything about Louvado's misconduct when the warrants in question were obtained and executed.[37]   At the time the warrants were litigated, the government had nothing more than the uncorroborated hearsay speculation of an unreliable witness ███████.  It was not until midway through the MMP trial that supervisors in the office learned of the first direct allegation of wrongdoing against Louvado by a person with first-hand knowledge ███████.  At that point, they knew that (a) Louvado would not be called as a witness in the case, and (b) there was no suggestion of any misconduct by Louvado during the MMP investigation, and (c) the statements of probable cause supporting the Louvado-authored warrants could be independently verified by other officers and

---

[37]    As discussed above, the defendants are wrong in their insinuations regarding the *Powell/Fitzgerald* and *Davis* cases.  There was no adverse credibility finding in either case, and in fact, in the *Powell/Fitzgerald* case, Judge Legg credited Louvado's testimony.

evidence.  Therefore, the government had no disclosure obligation under *Brady* or *Giglio*.[38]

*Second*, the defendants cannot demonstrate materiality.  The defendants acknowledge that the relevant inquiry for materiality purposes is whether the Louvado misconduct evidence would have produced a different result "with regard to potential suppression of the wiretaps and warrants."  ECF 1505-1, at 24.  The Fourth Circuit has recognized that there is a high bar for materiality when it comes to pure impeachment evidence, *i.e.*, non-exculpatory evidence bearing on a trial witness's credibility.  In general, impeachment evidence is considered to be material for *Brady/Giglio* purposes "where the witness in question supplied the only evidence linking the defendant to the crime" or "the only evidence of an essential element of the offense."  *United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013) (quoting *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998)).

Here, Louvado was not a key witness at a hypothetical suppression hearing; indeed, he was not even a *necessary* witness.  As discussed above, had there been a *Franks* hearing challenging the Louvado-authored wiretaps and warrants, all of the material in Louvado's affidavits could have been verified by other officers and by physical evidence.  Accordingly, the defendants cannot show a reasonable probability that the Louvado misconduct evidence would have resulted in a different outcome.  *Cf. Bartko*, 728 F.3d at 340 (affirming denial of defendant's motion for new trial based on government's failure to disclose impeachment evidence regarding a witness whose testimony was "corroborated by substantial documentary evidence" and by other trial witnesses); *United States v. Dunham*, 673 Fed. App'x 256 (4th Cir. 2014) (rejecting *Brady* claim based on

---

[38]     Furthermore, as discussed above, the GTTF investigators were continuing to conduct a covert investigation in an attempt to corroborate ████████'s allegation and bring Louvado to justice.  Supervisors in the office made a reasoned decision that they believed would protect the integrity of the corruption investigation without impinging on the defendants' right to a fair trial.

government's failure to disclose that prison officer who testified at trial was himself under investigation for smuggling contraband, ruling that the testimony "was cumulative and corroborative"); *United States v. Langford*, No. 17-4571, 2019 WL 1977200, at *4 (4th Cir. May 3, 2019) (affirming denial of defendant's motion for new trial based on government's failure to disclose that one of its trial witnesses was under investigation for fraud offenses, holding that "the newly discovered evidence was merely impeaching, was not material, and would not have resulted in an acquittal").

Perhaps realizing that they cannot prevail under the *Brady/Giglio* line of cases, the defendants instead invoke this Court's decision in *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013).  But *Fisher* has no application here, where the information allegedly withheld from the defendants is impeachment material with no factual nexus to the defendants' case.

In *Fisher*, a corrupt DEA officer, TFO Lunsford, obtained a search warrant for the defendant's residence and vehicle based on information supposedly provided by a reliable confidential informant about the defendant's drug trafficking activity.  *Id.* at 462–63.  The search warrant led to the recovery of crack cocaine and a loaded handgun.  *Id.* at 463.  The fruits of the search warrant formed the sole basis of an indictment charging the defendant with possession with intent to distribute crack cocaine and possession of a firearm by a convicted felon.  *Id.*  The defendant pled guilty and was sentenced to ten years.  *Id.*  Roughly a year later, TFO Lunsford pled guilty to various fraud and theft offenses in connection with his duties as an officer.  *Id.*  He admitted to having lied in a number of affidavits and reports.  *Id.*  Regarding the defendant's case specifically, he admitted that he lied in the affidavit supporting the search warrant and invented the confidential informant.  *Id.*

The Fourth Court held that "the officer's affirmative misrepresentation, which informed

73

the defendant's decision to plead guilty and tinged the entire proceeding, rendered the defendant's plea involuntary and violated his due process rights." *Id.* at 462. The Court noted that the case involved "highly uncommon circumstances in which gross police misconduct [goes] to the heart of the prosecution's case," and not merely a situation in which the defendant's "calculus misapprehended the quality of the state's case" based on the reliability of its witnesses. *Id.* at 466. Because TFO Lunsford's lies in the search warrant "may well have" led to a successful motion to suppress the sole evidence of the defendant's guilt, the Court found a "reasonable probability" that the defendant would not have entered a guilty plea had he known the true facts of the case. *Id.* at 468–69.

*Fisher* established a two-part test for determining whether a guilty plea is involuntary. To meet that standard, a defendant must show that (i) there was "some egregiously impermissible conduct" that "antedated the defendant's entry of his plea," such as "an officer's deliberate misrepresentation that underpinned the entire case against him," and (ii) the misconduct was "material" to the defendant's decision to plead guilty; that is, there is a "reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 465–67. *Fisher* dealt with police misconduct that went "to the heart of the prosecution's case," and formed the sole basis for the incriminating evidence against the defendant. *Id.* at 466. It did not deal with *extrinsic* evidence of officer misconduct—that is, evidence of a police officer's wrongdoing in *other cases*.

*Fisher* is of questionable relevance here because it dealt with the voluntariness of a guilty plea, and not with the reliability of a trial verdict. But in any event, the defendants cannot satisfy either prong of the *Fisher* test. With respect to the first prong, the defendants do not allege that Louvado engaged in any misconduct *in this case*—let alone misconduct that underpinned the entire

case against them.  They do not claim that Louvado made any affirmative misrepresentations in the affidavits supporting the wiretaps and warrants at issue.  They do not claim that the 2009 theft is in any way connected to the facts of this case, or has any bearing on their actual guilt or innocence.  It is, instead, a classic example of impeachment evidence that could have been used to attack Louvado's credibility had he testified against the defendants—which he never did.

With respect to *Fisher*'s second prong, the defendants cannot demonstrate that the information about Louvado's prior misconduct was material to the warrant applications.  As we have explained, the information did not go "to the heart of the prosecution's case," *Fisher*, 711 F.3d at 465, because Louvado's misconduct had no relationship to the facts of the case, and Louvado would not have been a necessary witness at any *Franks* hearing.

The defendants point to no authority, nor can they, suggesting that *Fisher* applies in a case such as this.  Indeed, numerous courts, all from within this Circuit, have held that *Fisher* does not apply where the information allegedly withheld from the defendant is *impeachment* information with little or no connection to the defendant's case.  *See*, *e.g.*, *United States v. Coats*, 2018 WL 1570241 at * 5–6 (D. Md. March 30, 2018) (declining to apply *Fisher* in a case involving the same corrupt officer, TFO Lunsford, even though there was evidence that Lunsford had stolen a watch from the defendant, because "multiple officers were involved in the observations and investigations that led to [the defendant's] conviction"); *Carmon v. United States*, 2015 WL 5838634 at * 3 (E.D.N.C. Oct. 7, 2015) (distinguishing *Fisher*, and holding that "[w]hile criminal activity by [Agent] Edmonds is undisputed … petitioner makes no allegation as to any connection between such criminal conduct and the prosecution in this case"), *appeal dismissed*, 634 Fed. App'x 932 (4th Cir. Mar. 1, 2016); *Richardson v. United States*, 2015 WL 4366198, at * 3–4 (E.D.N.C. 2015) (holding *Fisher* inapplicable where "petitioner ha[d] not alleged that the alleged

75

criminal conduct by [the officer] related specifically to the police investigation that underpinned the government's evidence in this case"); *Lewis v. United States*, 2015 WL 2401514 at * 8–9 (E.D.N.C. May 20, 2015) (distinguishing *Fisher* where criminal charges brought against an officer involved in the defendant's arrest "d[id] not permit an inference of connection to this case" and therefore constituted mere impeachment evidence that, pursuant to *Ruiz*, the government was not required to disclose prior to a guilty plea), *appeal dismissed*, 627 Fed. App'x 216 (4th Cir. Dec. 22, 2015); *see generally United States v. Cohen*, 2015 WL 5331697 at * 6-8 (D. Md. Sept. 10, 2015) ("*Fisher* … involved misconduct relating to the evidence underlying the charges to which the defendant pled guilty.").

In short, the *Fisher* line of cases further demonstrates why the defendants are not entitled to a new trial: they cannot point to *any* misconduct in this case, let alone misconduct that materially affected the outcome of the case.

## IV.    CONCLUSION

In summary, the defendants cannot provide any legal basis for disturbing the guilty verdicts in this case.  They do not come close to satisfying *Custis*'s third, fourth, and fifth factors.  The newly discovered evidence of Louvado's 2009 misconduct would not have enabled them to mount a successful *Franks* challenge to the Louvado-authored warrants because the probable cause for the warrants could be, and was, independently verified by dozens of other officers who testified credibly at trial, as well as by audio, video, photo, and other physical evidence.  Even if the Louvado-derived evidence had been suppressed, the defendants still would have been buried by an avalanche of evidence establishing their guilt on all counts.  The government also had no obligation under *Brady*, *Giglio*, or *Fisher* to disclose *non*-exculpatory information bearing on the credibility of a *non*-witness that was *not* material to the outcome at trial.

There is no question that Louvado engaged in serious misconduct for which he is justly being prosecuted.  But nothing about that prosecution undermines confidence in the guilty verdicts in this case.  The defendants are not entitled to a windfall because of past misconduct by one of hundreds of law enforcement officers who participated in the investigation where that misconduct has no relationship to the facts of the case and no bearing on their guilt or innocence.  A new trial would not be in the interests of justice.  For all the foregoing reasons, the defendants' motions should be denied.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:  *Christina A. Hoffman*
Christina A. Hoffman
Lauren E. Perry
Assistant United States Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland  21201
(410) 209-4800

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 14, 2020, I caused a copy of the foregoing Government's Consolidated Response to Defendants' Motions for New Trial to be filed electronically with the Court using the CM/ECF system and served to all counsel of record.

Christina A. Hoffman
Christina A. Hoffman
Assistant United States Attorney